EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

MCI INTERNATIONAL, INC., Defendant.

Civ. A. No. 90–1198(MTB).

United States District Court,
D. New Jersey.

Aug. 2, 1993.

Susan C. Cassell, Asst. U.S. Atty., Newark, NJ, and Valerie Toohey O'Dell, E.E.O.C., Philadelphia, PA, for plaintiffs.

Joseph A. Dickson, Clemente, Dickson & Mueller, Morristown, NJ, and Christine H. Perdue, Huton & Williams, Fairfax, VA, for defendant.

## OPINION

BARRY, District Judge.

### I. Introduction

Plaintiff Equal Employment Opportunity Commission ("EEOC") brings this action against MCI International, Inc. ("MCII") on behalf of thirty-nine former MCII employees alleging that MCII made certain employment decisions on the basis of age in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–634. The allegedly discriminatory acts arise for the most part out of the acquisition by MCII of RCAG Global Communications, Inc. ("RCAG") in May, 1988. Plaintiff claims that MCII laid off employees, failed to subsequently rehire employees, and retaliated against employees on the basis of age.

■ MCII has moved for summary judgment on the layoff claims brought on behalf of thirty-four of the thirty-nine claimants and on all the failure to rehire and retaliation claims. For the reasons which follow, defendant's motion for summary judgment will be granted in its entirety.[1]

### II. Factual Background

The following background facts have been stipulated by the parties. On May 16, 1988, MCII, a subsidiary of MCI Communications Corporation, acquired RCAG Global Communications, Inc. ("RCAG"), located in Piscataway, New Jersey, from the General Electric Company. At the time of the acquisition, MCII operated facilities in New York City, Fort Lee, New Jersey, and Rye Brook, New York.

RCAG salaried employees were eligible to participate in the RCA Retirement Plan. Among the benefits offered under this plan was the option to receive pension benefits in a lump sum payment rather than periodic payments. In addition, the RCA Plan offered medical and life insurance coverage to retirees at reduced costs. In late 1987, General Electric announced restrictions on the lump sum payment option after December 31, 1988. These restrictions were rescinded in February, 1988.

The contract of sale between General Electric and MCI provided that retiree medical and life insurance benefits under the RCA Retirement Plan would be preserved for all RCAG employees 55 years of age or older at the time of the acquisition. Thus, RCAG employees 55 or older as of the purchase date could later qualify for the RCA medical and life insurance benefits.

Between May 17 and May 20, 1988, MCII sent welcome letters to the RCAG employees who were being retained, informing the recipient of his or her MCII departmental assignment, supervisor, salary and grade, and work location. The letters also provided information about MCII's performance review system and informed the employees that they were covered by MCII's benefits.

Letters were also sent to those employees who were being released. These letters described the MCII benefits available: severance pay based on length of employment using years of service with RCAG to calculate the severance due, pay for unused vacation time, and continuation of medical and life insurance benefits for the duration of severance pay with an option to continue coverage thereafter at the employee's own expense. MCII followed a general procedure in laying off employees. A meeting was held between the employee, his or her supervisor, and a representative from MCII's human resources department. At this meeting, the employee was given the layoff letter and the supervisor explained that the layoff was the result of reductions in staff.

Of the thirty-nine claimants remaining in this action,[2] twenty-three were laid off short-

---

1. MCII has also moved to suppress plaintiff's Statement of Material Facts as to Which There is no Dispute, submitted pursuant to Rule 12 G of the General Rules of the United States District Court for the District of New Jersey, as overlength. This motion will be rejected. The page limitation of General Rule 27 B which MCII invokes in support of its motion applies to briefs and has not been incorporated into General Rule 12 G.

2. At one point in this action, plaintiff was asserting claims on behalf of fifty-four claimants. It no longer asserts claims on behalf of the following individuals listed in Attachment A to the Second Amended Complaint: Kenneth Buttner,

ly after the acquisition; the remaining sixteen claimants were terminated between June, 1988 and June, 1990. All but Joseph Coppola, who was employed at MCII's New York City facility, were employed at MCII's Piscataway, New Jersey facility at the time they were laid off.

### III. General Statement of the Law

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Which facts are material is dependent on the substantive law being applied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the burden of demonstrating that there are no genuine issues of material fact for trial regardless of which party would have the ultimate burden of proof at trial. *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.) (in banc), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Where the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden in a motion for summary judgment by showing that the nonmoving party has failed to adduce evidence sufficient to establish an essential element which the nonmovant would have to prove at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the moving party establishes such a failure of proof, the nonmoving party must go beyond the pleadings and demonstrate specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553; *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If the evidence is merely colorable or not particularly probative, summary judgment may be

granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. In deciding a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir.1992).

Plaintiff alleges violations of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–634. Section 7(b) of the ADEA provides for enforcement of the Act by incorporating the powers, remedies, and procedures of sections 16(b), 16(c), and 17 of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 216(b), 216(c), and 217. Under sections 16(c) and 17 of the FSLA, the EEOC may sue on behalf of an employee and may seek injunctive relief. 29 U.S.C. §§ 216(c) and 217; *EEOC v. Corry Jamestown Corp.*, 719 F.2d 1219, 1221 (3d Cir. 1983). Recognizing the advantages in proceeding collectively not only to ADEA plaintiffs but to the judicial system by virtue of the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity", an "opt-in" class action may be brought under § 216(b), and damages for a violation of the ADEA obtained. *Hoffman–La Roche, Inc. v. Sperling*, 493 U.S. 165, 170, 110 S.Ct. 482, 486, 107 L.Ed.2d 480 (1989).

■ The EEOC brings this action pursuant to these provisions, characterizing what is before the court as a "class action". Pl. Opp.Br. at 1. It is not. Wholly aside from the fact that in this circuit it has been assumed, if not decided, that certification of a purported class is required, *Lusardi v. Lechner*, 855 F.2d 1062 (3d Cir.1988), and there has been no certification here, the "similarly situated" requirement of § 216(b) is simply not met. That requirement, while less strin-

---

Fannic Carter, Frank Cyrankowski, Ligaya Formanes, Carol Geyette, Irma Klein, John Lee, Sal Ligammari, Donald MacMillan, Wenceslao Orellana, Willie Owens, Raymond Raimondi, Mark Stein, Ronald Van Dzura, and Jack Wiley. It should be noted that the five page Second Amended Complaint sought "to correct [defendant's] unlawful employment practices on the basis of age", specified only one claimant's name

in the body of the complaint, and made but one passing reference to "others [fifty-two of them, the court notes] listed in Attachment A herein and incorporated by reference...." ¶9. It is probably fair to assume that the Magistrate Judge who permitted the filing of the Second Amended Complaint by order dated April 22, 1991 could not have known what would follow.

gent than the requirement of F.R.Civ.P. 23(b) that common questions of law and fact predominate, nonetheless mandates that there be a common thread unifying the putative class of employees allegedly laid off on the basis of age. *Lusardi v. Xerox Corp.,* 118 F.R.D. 351, 361 (D.N.J.1987).

What is seen here is " 'a monster that no one can deal with, made with a lot of individual people with specific grievances' ". *Id.* There is no single, company-wide action but, rather, layoffs by various supervisors of persons, on an employee by employee basis, of widely disparate ages, salaries, and positions over a two year period of time. The factual and/or employment setting of each person's layoff is different, many varying questions of law are raised, and the defenses posited are individual to each or small groups of those persons. And while this action alleges that the putative class was adversely affected by a pattern or practice of discriminatory treatment, no such pattern or practice is the least bit evident. Indeed, the only common thread seen here is that the persons involved were forty years old or older and were laid off by MCII. That is clearly not enough.

Thus, class action or no class action, what is before this court on this motion are thirty-four separate disparate treatment cases and, were this motion to be denied in all respects instead of granted, thirty-nine separate disparate treatment cases EEOC would have this court try as one. To say that a trial of this action would be complicated and lengthy would be a gross understatement, as evidenced, for starters, by the fact that the list of prospective witnesses covers more than ninety *pages* of the Final Pretrial Order. This action could most likely have been pared down had application to do so been made. It was not, and this court will press on.

■ The ADEA prohibits discrimination against persons over age 40 with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). In order to ultimately prevail in an action under the ADEA, a plaintiff must prove by a preponderance of the evidence that age was a determinative factor in the decision of the employer under consideration. *Billet v. Cigna*

*Corp.,* 940 F.2d 812, 816 (3d Cir.1991); *Bartek v. Urban Redevelopment Authority,* 882 F.2d 739, 742 (3d Cir.1989). Plaintiff need not show that age was the exclusive reason for the adverse employment action but, rather, that "age made a difference" in the decision. *Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393, 1395 (3d Cir.), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984).

### IV. Layoff Claims

#### A. Direct Evidence

■ As in any other case, a plaintiff claiming discrimination may prove his or her case with either direct or circumstantial evidence. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983). If the plaintiff is able to point to direct evidence of discrimination, the burden shifting analysis first enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), is inapplicable, *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985); *Gavalik v. Continental Can Co.,* 812 F.2d 834, 853 (3d Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987); *Miller v. State Chemical Mfg. Co.,* 706 F.Supp. 1166, 1170 (W.D.Pa.1988), and the "problems of proof are no different than in other civil cases." *Goodman v. Lukens Steel Co.,* 777 F.2d 113, 130 (3d Cir.1985), *aff'd,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *see also Dillon v. Coles,* 746 F.2d 998, 1002–03 (3d Cir.1984); *Perry v. Prudential–Bache Secur., Inc.,* 738 F.Supp. 843, 851 (D.N.J.1989), *aff'd without opinion,* 904 F.2d 696 (3d Cir.), *cert. denied,* 498 U.S. 958, 111 S.Ct. 386, 112 L.Ed.2d 397 (1990). Thus, a plaintiff who has demonstrated by direct evidence that a genuine issue of fact exists as to whether age was a determinative factor in his or her discharge has shown, just as in any other case, that there is a factual dispute which must be resolved at trial by the fact-finder. *Miller,* 706 F.Supp. at 1170–71. A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a

verdict for plaintiff. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

■ Direct evidence is "[e]vidence, which if believed, proves [the] existence of [the] fact in issue without inference or presumption." Black's Law Dictionary 460 (6th ed. 1990); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir.1990); *Perry*, 738 F.Supp. at 851 (evidence was not direct where discrimination on the basis of age had to be inferred from an employer's remarks). Plaintiff touts several pieces of evidence as "direct." First and foremost among these, at least in plaintiff's view, is the deposition testimony of James Patrick, one of the claimants in this action, that while at RCAG, he was told by his superior, John Shields, to prepare a layoff list of employees in his department at RCAG, the Engineering Department, based on considerations such as who was doing the least amount of work given his or her salary and who was nearing retirement.[3] Patrick Dep. at 55–60. Patrick testified that he "always" prepared such lists and that this particular "list [of] who should stay and who should go" was prepared approximately one or two months prior to the takeover of RCAG by MCII. *Id.* at 55. Three of the claimants on whose claims MCII now moves for summary judgment were placed on that list: Peter Wu, George Doss, and Calvin Gum.[4] Patrick Aff. ¶ 4.

MCII points out that Patrick gave the list to Shields but not to anyone at MCII and did not know if Shields or anyone else at RCAG ever gave the list to anyone at MCII. Patrick Dep. at 72. Indeed, Patrick did not know what was done with the list after he gave it to Shields. Patrick Dep. at 56. MCII further points out that Patrick never discussed layoff decisions with any MCII managers and played no part in the layoff decisions. Patrick Dep. at 128, 131.

Documents which list employees' ages, even documents which relate to a reduction in force, are not *per se* direct evidence of discrimination and may, indeed, be innocuous. *See Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 514 (6th Cir.1991); *Earley*, 907 F.2d at 1082. A document prepared (and statements made) expressly for the purpose of determining which employees could be laid off with consideration given to the employees' proximity to retirement, however, is not so innocuous, and were there any evidence that the list was prepared at the behest of, and/or reached MCII or played any part in the layoff decisions, plaintiff might well have direct evidence of discrimination. But that essential link to the defendant in this case is missing. There is utterly no evidence that the defendant, as opposed to RCAG, had anything to do with the list or anything that emanated from the list, including discussions with Patrick or Shields; indeed, Shields testified that he does not recall any discussion in his meetings with defendant about defendant wanting to get rid of retirement-eligible employees. Shields Dep. at 88. It is, therefore, clear that plaintiff has not produced direct evidence of discrimination by defendant as to the employees on Patrick's layoff list, Peter Wu, George Doss, and Calvin Gum.

■ Second, plaintiff contends that a list of nonunion employees over the age of 55 constitutes direct evidence of discrimination. Pl.Trial Exh. 161. In addition to the typed title of the apparently computer-generated list, which reads "List of Non–Union Employees Over 55," is a handwritten title above which says "List of NU Empl with MED + Life Ins from RCA at Retirement." Passar-

---

3. Interestingly, at his deposition on June 20, 1991, Patrick was extremely reluctant to say other than that Shields "insinuated" that those who were near retirement should be put on the list and that Patrick "interpreted" what Shields said, finally stating that Shields said that if one was near retirement, perhaps he or she should be considered for inclusion on the list. In his affidavit, filed on October 30, 1992 in response to the motion for summary judgment, the reluctance had disappeared: "... I was instructed by John Shields, Director of Network Engineering, to prepare a layoff list which targeted employees near retirement age and those with high salaries." (¶ 4). Given the court's disposition of this claim of direct evidence, what if any weight should be accorded the affidavit given that it was submitted to fend off summary judgment, need not be decided.

4. The one additional claimant on the list made up by Patrick is Joseph Gleitman. Gleitman is one of the five claimants whose layoff claim is not the subject of this motion.

elli Aff., Def.Reply Exh. B42. This list contains the names of eleven claimants subject to this motion.[5] The list contains, among other things, the name, birth date, age, and date hired for each employee listed.

Contrary to plaintiff's characterization, this list does not constitute direct evidence of discrimination on the basis of age. The affidavit of Vincent Passarelli, who was and is employed in MCII's Human Resources Department and had responsibility for assisting in benefits issues in the transition of RCAG employees to MCII in 1988, indicates that he requested the list from RCAG's Employee Relations Department to keep track of which RCAG employees would be eligible to receive medical and life insurance benefits through General Electric at retirement. Def.Reply Exh. B42. The parties have stipulated that the contract of sale contained a provision pursuant to which retiree medical and life insurance benefits under the RCA Retirement Plan would be preserved for all RCAG employees over 55 at the time of the acquisition so that RCAG employees over 55 that went to work for MCII could later qualify for the RCA medical and life insurance benefits. Stip. ¶¶ 11–12. The letters exchanged in March, 1988 between MCII and RCAG indicate on their face that the purpose of the list was to assist in benefits administration. Def.Reply Exh. B42. This is confirmed by Passarelli's statement that he used the list only for benefits administration and that he shared the list only with his supervisor, Jeffrey Previte. Passarelli Aff., Def.Reply Exh. B42, ¶¶ 5–6. Anne Hughes, who worked in benefits administration at RCAG and subsequently at MCII, similarly states that the list was made to administer benefits and counsel employees. Hughes Aff., Def.Reply Exh.

B38, ¶ 5. *See Wilson,* 932 F.2d at 514 (maintenance of records of employees' birth dates and years of service not proof of discrimination absent direct evidence that the records were used in making adverse employment decisions); *Earley,* 907 F.2d at 1082 (documents relating to the number of employees eligible for early retirement which contained ages or birth dates of employees not direct evidence of age discrimination).

 The third piece of evidence characterized as direct evidence by plaintiff is a statement allegedly made by Patrick McKenna to George Eccleston in the course of laying off Eccleston. Eccleston testified that McKenna said to him that Eccleston had always wanted to retire at age 55 and that he, McKenna, had to keep the people that he thought would stay with him for the long term. Eccleston Dep. at 58. Eccleston conceded that for many years he and McKenna had discussed Eccleston's interest in retiring at age 55. *Id.* McKenna testified that when he had to provide a list of names for layoffs, he considered what the impact on his operation would be, and considered the fact that Eccleston had indicated that he was going to retire at age 55. Eccleston, it should be noted, was but six months away from his 55th birthday at the time of his layoff. McKenna reasoned that, given Eccleston's intention to retire, Eccleston could not be given any long term important work because it would hurt the operation if he retired as soon as he turned 55. McKenna Dep. at 84. *Id.* McKenna's statements do not constitute direct evidence that age played a role in the decision to lay off Eccleston; rather, those statements constituted a recognition of Eccleston's stated intention, which is not disputed, to retire in a matter of months.[6]

---

5. These are: Joseph Coppola, Dominick DeCeglie, George Doss, Joseph Fezza, Jack Gold, Calvin Gum, Donald Lee, Gerard Symbleme, Peter Theodore, William Terbo, and Dorothy Unger.

6. Plaintiff also raises McKenna's statements to Eccleston with regard to McKenna's layoff of John Sharp. To the extent that plaintiff argues that McKenna's statements to Eccleston (even were they direct evidence of discrimination as to Eccleston, which they are not) should be considered direct evidence of discrimination as to Sharp, that argument is rejected. *See Jackson v. GTE Directories Service Corp.,* 734 F.Supp. 258,

267 (N.D.Tex.1990) (statements constituting direct evidence of discriminatory intent as to one plaintiff may not be direct evidence as to another plaintiff because the jury would still have to infer that the intent pertains to the second plaintiff). Moreover, it appears that plaintiff concedes the propriety of this statement of law in its brief: "Such remarks evince a discriminatory animus, and a jury could *infer* that McKenna's age bias played a role in his decision to recommend Mr. Sharp for layoff." Pl.Opp.Br. at 16 (emphasis added).

The fourth and final piece of evidence which plaintiff urges as direct evidence is a statement allegedly made by Robert Ottman to Donald Moran when Moran applied for a position which would have been a promotion. According to Moran, after commenting that the job was very demanding and challenging, Ottman asked Moran how long it was until he could retire under the RCA program. Moran Dep. at 43–44. Even aside from the fact that there is nothing *per se* discriminatory about an employer asking an employee about retirement plans, *Murray v. Sears Roebuck & Company*, 722 F.Supp. 1500, 1505 (N.D.Ohio 1989), the claim relating to Moran is related to his layoff, not his failure to receive this promotion. Ottman's statement is not direct evidence as to whether Moran's layoff was the result of discrimination.

There is no direct evidence to support the layoff claims of Peter Wu, George Doss, Calvin Gum, George Eccleston, and Donald Moran, the only claimants as to whom "direct evidence" has been proffered. Because plaintiff has failed to point to direct evidence of discrimination with regard to these and the thirty other claimants the subjects of this motion, the court must consider the circumstantial evidence. This entails an application of the *McDonnell Douglas* shifting burdens analysis. *Chipollini*, 814 F.2d at 897; *see also Billet*, 940 F.2d at 816 n. 3.

## B. Indirect Evidence: The *McDonnell Douglas* Framework

If a plaintiff is unable to produce direct evidence of discrimination, he or she may proceed under the shifting burdens analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). This analysis came to be in recognition of the fact that in most cases direct evidence of discriminatory intent is unavailable or difficult to acquire. *Chipollini*, 814 F.2d at 897. Under the *McDonnell Douglas* analysis, a plaintiff must first establish a *prima facie* case of discrimination. This can be done by showing that plaintiff (1) belongs to the protected class, here 40 years of age or older; (2) was qualified for the position; (3) was dismissed despite being qualified; and (4) was ultimately replaced by a person sufficiently younger to permit an inference of age discrimination. *Gray*, 957 F.2d at 1078; *Billet*, 940 F.2d at 816 n. 3; *Chipollini*, 814 F.2d at 897. Where the discharged employee's job is eliminated and he or she is not replaced, the employee need only show that he or she was laid off from a job for which he or she was qualified while a younger employee was retained or treated more favorably. *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 342 (3d Cir.1990); *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1214 n. 1 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 60 (3d Cir.1988); *Berndt v. Kaiser Aluminum & Chemical Sales, Inc.*, 789 F.2d 253, 256–57 (3d Cir.1986); *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 792 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986); *Massarsky v. General Motors Corp.*, 706 F.2d 111, 118 (3d Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). A *prima facie* case creates a presumption of unlawful discrimination.

Once the employee has made out a *prima facie* case, the burden of production shifts to the employer to dispel the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for discharging the employee. *Gray*, 957 F.2d at 1078; *Billet*, 940 F.2d at 816; *Turner*, 901 F.2d at 342; *Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 53 (3d Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990).

If the employer meets its burden, neither the presumption nor the *McDonnell Douglas* framework are any longer relevant and the burden shifts back to plaintiff to prove by a preponderance of the evidence that defendant's stated reasons were a pretext for discrimination, *i.e.*, that the reasons were false *and* that discrimination (here, on the ground of age) was the real reason. *Saint Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2750, 125 L.Ed.2d 407 (1993). Importantly for this court's pur-

poses, *Hicks* explicitly rejected precedent of the Court of Appeals for the Third Circuit which held that a finding of pretext mandates a finding of illegal discrimination.[7] Importantly, too, *Hicks* implicitly rejected Third Circuit precedent which held that pretext—which *Hicks* construed to mean pretext for discrimination—may be proven merely by showing that the defendant's proffered reasons are unworthy of credence.[8] "[N]othing in the law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable". *Hicks*, — U.S. at —, 113 S.Ct. at 2751. A reason "cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason". *Id.* — U.S. at —, 113 S.Ct. at 2752 (emphasis in original). Thus, the Court concluded, once the defendant submits evidence of the reason for its action as to a particular plaintiff, the factfinder must decide not whether that evidence is credible but, rather, the ultimate factual issue in the case, *i.e.,* whether the employer intentionally discriminated against the plaintiff. *Id.* — U.S. at — – —, 113 S.Ct. at 2752–53. The plaintiff at all times bears the ultimate burden of persuasion. *Id.* — U.S. at —, 113 S.Ct. at 2749.

"Title VII does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action" or necessarily against employers whose proffered reason is unpersuasive or even obviously contrived. *Id.* — U.S. at —, 113 S.Ct. at 2756. Title VII only awards damages against employers who are proven to have taken adverse employment action by reason of, in that case, race. *Id.*[9] And under the ADEA, as under Title VII, if the employer's explanation for its decision is unworthy of credence, a plaintiff must also show at least indirect evidence of *age* motivation, which the court distinguished from "other unsavory motives". *Hazen Paper Company v. Biggins,* — U.S. —, —, 113 S.Ct. 1701, 1708, 123 L.Ed.2d 338 (1993).

Parenthetically, the dissenting opinion in *Hicks* complained of the "conflicting signals" given by the Court as to the scope of its holding, *id.* — U.S. at —, 113 S.Ct. at 2762, and specifically pointed to the Court's statement, — U.S. at —, 113 S.Ct. at 2749, that although proof of the falsity of the defendant's proffered reasons does not compel judgment for the plaintiff, such evidence without more "may ... suffice" or "will *permit* the trier of fact to infer the ultimate fact of intentional discrimination....", a statement on which the plaintiff in this case largely hangs its hat. The Court, however, at *id.* note 4, found "nothing whatsoever inconsistent between this statement and our later statements that (1) the plaintiff must show '*both* that the reason was false, *and* that discrimination was the real reason' ... and (2) 'it is not enough ... to *dis*believe the employer'.... *[T]here must be a finding of discrimination*". *Id.* (emphasis in original). And, it appears, the fears expressed in the *Hicks'* dissent that what it called the Court's "pretext-plus" approach "will result in summary judgment for the employer in the many cases where the plaintiff has no evidence beyond that required to prove a *prima facie* case and to show that the employer's articulated reasons are unworthy of credence", *id.*

---

7. The Supreme Court, — U.S. at —, 113 S.Ct. at 2750, cited *Duffy,* 738 F.2d at 1395–1396 as illustrative of cases whose holdings, in this respect, it rejected.

8. A host of Third Circuit cases have held that pretext may be proven either by showing that a discriminatory reason more likely motivated the defendant or by showing that the defendant's proffered reason is unworthy of credence. *See, e.g., Billet,* 940 F.2d at 816; *Turner,* 901 F.2d at 342; *Fowle v. C & C Cola, Div. of ITT–Continental Baking Co.,* 868 F.2d 59, 62 (3d Cir.1989); *Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200,

203 (3d Cir.1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988); *Chipollini,* 814 F.2d at 898. Clearly the latter, without more, is no longer sufficient.

9. *Hicks,* of course, was a Title VII case and not an ADEA case. The parties do not argue, however, that *Hicks* is not directly applicable here nor do they argue that any differences between Title VII and the ADEA would or should make a difference. *See Duffy,* 738 F.2d at 1400–02 (Adams, J., dissenting).

—— U.S. at ——, 113 S.Ct. at 2762, may in those many cases be realized.

While *Hicks,* of course, was not a summary judgment case, its principles can be incorporated into the well-understood summary judgment standard. Thus, defendant, as the moving party, bears the burden of demonstrating that there are no genuine issues of material fact for trial. Because plaintiff, as the nonmoving party, will bear the burden of proof of trial, the defendant may satisfy its burden by showing that plaintiff has failed to adduce evidence sufficient to establish an essential element which plaintiff would have to prove at trial—here, that the defendant's reasons were false and that discrimination was the real reason, and plaintiff must come forward with specific facts showing that there is, indeed, a genuine issue for trial.

The facts, of course, must be viewed in the light most favorable to plaintiff and all reasonable inferences must be drawn in plaintiff's favor. Thus, where the falsity of defendant's reasons is at issue, the facts must be viewed as plaintiff views them unless, of course, those facts are not probative of the issue of falsity or because merely conclusory statements are offered. But even assuming the falsity of defendant's reasons for purposes of summary judgment, plaintiff will have to demonstrate as to a particular claimant that those false reasons together with the *prima facie* case raise a genuine issue of material fact as to whether the defendant intentionally discriminated against that claimant and, of course, may submit additional facts, if any, to support this claim. If plaintiff cannot do so, summary judgment will be granted; if plaintiff does do so, summary judgment will be denied.

No reasonable jury could find from the facts to which plaintiff points and any reasonable inferences therefrom that intentional age discrimination was practiced here as to any claimant, and this court cannot conclude that any genuine issue in that regard has been raised. Tough business decisions had to be made, and they were made without any unlawful reference to age. Parenthetically, albeit subtly, this conclusion is reinforced by the fact that the parties briefed defendant's motion for summary judgment before the decision in *Hicks* was announced with plaintiff focusing, virtually exclusively, on why defendant's reasons were unworthy of credence and barely at all on how or why the real reason was discrimination.[10]

Thus, even assuming that plaintiff has made a sufficient showing that defendant's reasons were unworthy of credence, and as to almost no claimants did it do so, evidence of age motivation or a reasonable inference thereof sufficient to raise a genuine issue of material fact—or an issue at all—is conspicuously lacking. Moreover, no showing has been made that any of defendant's reasons, which plaintiff did *not* challenge as being false, were a proxy for or could be correlated with age. *See Hazen Paper,* —— U.S. at ——, 113 S.Ct. at 1707. And, notably, even in the supplemental briefs submitted to this court post-*Hicks,* plaintiff's inability to show that what this case is about is discrimination on the ground of age was glaringly apparent. An analysis of each claimant's case under the *McDonnell Douglas* framework should underscore that conclusion. Indeed, for what it is worth, this court predicts that this case, were it to go beyond this point, would be a paradigm example of a very long, very fact-intensive trial with the jury finding no cause of action and stating, as juries so often did pre-*Hicks,* that there was simply no evidence of age in the case.

One observation must be made before entering into the *McDonnell Douglas* analysis as to each of the thirty-four claimants the subject of this motion. EEOC has, in a nutshell, put this court to the test by essentially hanging it out to dry. EEOC, in its 47 page brief, has given one, two or, perhaps, three pages of its attention to each claimant's case with that attention typically little more than bold or perfunctory statements or a few facts plucked from a mosaic of facts, followed

---

**10.** It is not surprising that, at least initially, plaintiff focused its attention on why defendant's reasons were unworthy of belief given that, pre-*Hicks,* it had been understood in this circuit that if a genuine issue in that regard had been shown, summary judgment would be denied. This court, too, initially considered this case pre-*Hicks* but even then found only a handful of claimants as to which defendant's motion would have been denied, and denied just barely.

by the citation, by exhibit number only, to various exhibits in the record (which frequently belie the statements for which they were cited) and an occasional case citation. This court has, thus, been required to attempt to glean from the record the arguments which EEOC could have made and then develop and analyze those arguments in light of the record and the law. Stated somewhat differently, this court, with little meaningful help from EEOC, has made every effort to do justice to each individual's claims.

### 1. *James Patrick*

James Patrick was 47 years of age when MCII acquired RCAG in May, 1988 and he was laid off. Stip. ¶¶ 241, 245. At the time of his layoff, Patrick held the title of Manager, Facilities and TOCC Engineering within RCAG's Network Engineering Department, Stip. ¶ 242; Pl.Trial Exh. 169, and was responsible for managing the technical operating control center (TOCC) and customer engineering. Patrick Dep. at 41–43. MCII asserts that plaintiff cannot establish a *prima facie* case with respect to Patrick because Patrick's job was eliminated. An ADEA plaintiff who has not been replaced—as is usually the case if one's job has been eliminated—may nonetheless satisfy the fourth prong of the *prima facie* case, which ordinarily requires a showing that the plaintiff was replaced by a younger individual, by showing that others not in the protected class were retained or treated more favorably. *Turner*, 901 F.2d at 342; *White*, 862 F.2d at 60. Of course, the plaintiff must show that those retained were similarly situated in terms of qualifications and position. *Hill v. Bethlehem Steel Corp.*, 729 F.Supp. 1071, 1075 n. 6 (E.D.Pa.1989), *aff'd without opinion*, 902 F.2d 1560 (3d Cir.1990).

Plaintiff asserts that MCII retained two younger employees to perform Patrick's duties: Larry Stone, age 33, and Lou Marchese, age 31. Some of the order processing functions previously performed by Patrick were, indeed, taken over by Stone in a different department under Leo Cyr. Fitzgerald Dep. at 17. In addition, Irene Paladino, age 39, assumed some of Patrick's order process-ing and facilities duties. Patrick Dep. at 90. The circuit engineering portion of Patrick's job was taken over by Marchese and remained in the Engineering Department. Fitzgerald Dep. at 16–17; Patrick Dep. at 91. Although the technical specifics of each part of Patrick's job and who assumed which responsibility are not entirely clear from the record, the court is satisfied that Patrick has shown that three similarly situated employees were treated more favorably than Patrick. *See Turner*, 901 F.2d at 342 (evidence that three managers more junior than plaintiff took over plaintiff's managerial responsibilities sufficed to show that others similarly situated were treated more favorably for purposes of *prima facie* case); *Massarsky*, 706 F.2d at 118 (*prima facie* case easily made out). Accordingly, plaintiff has met its initial burden of establishing a *prima facie* case as to Patrick.

MCII asserts as nondiscriminatory reasons for Patrick's layoff that he lacked the technical ability and managerial skills to be a manager in the reorganized Network Engineering Department. Lance Boxer, MCII's Senior Manager of Network Engineering, expressed his view as to why Patrick was not qualified for a position in his department. First, in a meeting with Patrick just prior to the MCII acquisition, Boxer found Patrick's philosophy and management style to be inconsistent and ineffective. Boxer Dep. at 25. Second, Patrick did not have an engineering degree. *Id.* Third, Boxer was unable to "move functions around" to create an opening given Patrick's inadequate technical skills. *Id.*

Plaintiff argues that the reasons proffered are not worthy of credence. First, plaintiff notes that Boxer's assessment of Patrick's management style was based on a one hour interview—a fact Boxer himself brought up in his deposition. Boxer Dep. at 26–27. Second, plaintiff relies on the fact that Patrick's immediate supervisor, John Shields, was "pretty shocked" to see that Patrick was being laid off and objected to the decision. Shields Dep. at 11, 14, 16–17. *See Pears v. Spang*, 718 F.Supp. 441, 444 (W.D.Pa.1989) (relevant to pretext that immediate supervisor was not consulted and expressed surprise

at layoff).[11] Finally, Patrick states at ¶ 2 of his affidavit, filed in response to the motion for summary judgment, that his performance was always highly rated and he was never criticized for being deficient in technical ability, that he was never told he needed an engineering degree to be a technical manager, and that numerous other technical managers at RCAG were not degreed engineers.

It seems clear, at least to the court, that Patrick's say-so that a one hour interview was not long enough and Shields' belief that Patrick should have been retained without any explanation as to why are insufficient to show that a genuine issue exists as to whether defendant's reasons are unworthy of belief. Moreover, Patrick's generalized conclusion that he was always highly rated cannot rebut a specific reason for his layoff. *Anderson v. Stauffer Chemical Co.*, 965 F.2d 397, 403 (7th Cir.1992). And if he was never criticized or told he needed an engineering degree, "from a legal perspective managers are not compelled to convey their dissatisfaction to employees" and the effect of a failure to do so perhaps indicates that the employee had been receiving the benefit of the doubt. *Healy*, 860 F.2d at 1216.

But the issue, of course, is whether Patrick was laid off on account of his age and not whether he was laid off for an insufficient or inaccurate reason in some general sense; indeed, the court will assume, for purposes of summary judgment, that defendant's reasons are unworthy of credence. Even given that assumption, however, plaintiff has not presented this court with any evidence from which it could be said that a genuine issue of material fact exists that but for his age he would not have been laid off. Summary judgment will be granted as to Patrick's layoff claim.

2. *James Marsh*

▮ James Marsh was laid off at the age of 51 from his position as a lead engineer in the Engineering Department's network support group following the acquisition in May, 1988. Stip. ¶¶ 205–207, 209. MCII does not challenge plaintiff's ability to establish a *prima facie* case as to Marsh, but asserts that Marsh was chosen for layoff because of poor performance. In September, 1987, less than one year before the layoff, Marsh received an unfavorable evaluation by his supervisor, Joseph Fitzgerald. Fitzgerald Dep., Exh. 3. The evaluation called Marsh's performance "unsatisfactory" and cited as particularly problematic his ability to communicate and his level of technical involvement with his projects. After advising Marsh that his performance needed improvement, the evaluation concluded that "Your failure to perform acceptably may result in your removal from your position and possible dismissal." Fitzgerald Dep. at 94 and Exh. 3. Plaintiff does not dispute that of the three lead engineers in Fitzgerald's group, Marsh was rated the lowest. Fitzgerald Dep. at 95; Norris Aff. ¶ 4.

Plaintiff has failed to raise a factual issue as to pretext. Plaintiff argues that Marsh's performance was rated "satisfactory" by Fitzgerald in a December, 1987 evaluation prepared as a follow up to the September, 1987 evaluation. This later evaluation noted that improvement had been made since the unsatisfactory rating but that "[m]ore improvement is needed in order for you to become a really effective leader." Fitzgerald Dep., Exh. 4. In addition, Marsh testified that he and Fitzgerald did not see eye to eye, that he thought that Fitzgerald had a "vendetta" against him, and that he thought that Fitzgerald resented him because of his age and experience. Marsh Dep. at 17–18, 28–29. The only hint of an age-based bias on the part of Fitzgerald evidenced by Marsh's testimony is an allegation that Fitzgerald made some comments that Marsh may not have been informed on a technical aspect of RCAG's business because of the length of time he had been out of school. Marsh Dep. at 29. Neither this attenuated argument nor the alleged "vendetta," both of which are supported only by Marsh's opinion, is sufficient to raise an issue of pretext. Summary

---

11. "Pretext", it must be recognized, has been construed by courts in various ways and, thus, it cannot be assumed that when the word has been used in a particular case it necessarily has the meaning that *Hicks* has attributed to it.

judgment is appropriate as to his layoff claim.

### 3. Joseph Coppola

■ Joseph Coppola was laid off from his position in the New York City engineering group in May, 1988 at the age of 58. Stip. ¶¶ 105–107, 109. MCII contends that plaintiff cannot make out a *prima facie* case of age discrimination with respect to the layoff of Coppola because plaintiff cannot show that younger employees similarly situated were treated more favorably. The parties dispute which employees were "similarly situated" with respect to Coppola.

The names and ages of the four members of the New York City engineering group other than Coppola at the time of the acquisition were: Jack Morita, the group leader (age 64), John Donnelly (age 62), John Dietz (age 60), and Joel Zweier (age 46). Stip. ¶ 110. Coppola was the only one of the five laid off. *Id.* MCII claims that only Morita and Donnelly were similarly situated and that, because Coppola was the youngest of the three, and the second youngest in the department, no *prima facie* case of age discrimination can be established. Plaintiff is of the opinion that Dietz and Zweier were also similarly situated and that because the younger Zweier was treated more favorably, it has met the requirements of the *prima facie* case. It should be noted that although Zweier, age 46, was not outside the protected age group, because he was "sufficiently younger" than Coppola a showing that he was treated more favorably than Coppola would suffice for a *prima facie* case under Third Circuit law. *See Maxfield,* 766 F.2d at 792.

MCII's argument that only Morita and Donnelly were similarly situated to Coppola is based on the type of work done by them vis-a-vis the work done by Dietz and Zweier. Morita, Donnelly, and Coppola were involved in circuit installation at the New York City facility. McDonald Dep. at 22–23. Coppola specialized in narrow band circuits, while Donnelly specialized in wide band circuits. Muller Dep. at 36, 39–40. Dietz was a switching engineer and was involved in a project in Guam. Muller Dep. at 40; Morita Dep. at 9. Zweier was a construction engi-neer, responsible for dealing with construction projects, power, and air conditioning at the New York City facility. Muller Dep. at 40–41. While both Dietz and Zweier had engineering degrees and Coppola did not, *see* Coppola Dep. at 60, James McDonald de-scribed Coppola as "a hardworking, dedicat-ed individual who turned out more work than any other two people combined." McDonald Dep. at 19.

While it is clear that there was some dif-ference in the general work done by Coppola and Zweier, *see* Muller Dep. at 41, to say that Dietz and Zweier were not similarly situated for purposes of the *prima facie* case would be too narrow a reading of what is required. The New York City facility had a five person engineering department; each of the five had an area of expertise. To extin-guish Coppola's claim of age discrimination on the basis that no younger employee with his specialization was treated more favorably would place a nearly impossible burden on him. The court holds that Coppola has made a sufficient showing of a *prima facie* case.

MCII states, however, that Zweier's con-struction skills constitute a legitimate, non-discriminatory reason for laying off Coppola rather than Zweier. Two pieces of evidence are raised in rebuttal. First, McDonald stat-ed that it was more likely that Coppola could perform Zweier's job function than vice ver-sa. McDonald Dep. at 26. A difference of opinion, pure and simple. Second, plaintiff notes that four months after Coppola was laid off, MCI advertised in the newspaper for openings in circuit installation. Coppola Dep., Exh. 11. MCII asserts that the posi-tions advertised were different from Coppo-la's position, and plaintiff has not cited any-thing which would permit a contrary conclu-sion much less anything which would indicate that positions in circuit installation were available at or about the time Coppola was laid off. Be that as it may, there is neither evidence showing that there is a genuine issue for trial, nor a reasonable inference, that discrimination on the ground of age prompted MCII's actions. Summary judg-ment will be granted as to Coppola's claim.

#### 4. *Donald Lee*

Donald Lee was laid off from his position as a principal member of the engineering staff of the Telex Systems Department in May, 1988 at the age of 51. Stip. ¶¶ 187–189, 191. His duties in the engineering department included hardware engineering as well as software programming. Lee Aff. ¶ 5; Lang Dep. at 14. Lee reported through his supervisor, Nouzer Mistry, to Rudolph Lang, RCAG's manager for telex switching systems, who, in turn, reported to Brian Mair, the Director of Software Engineering. Lee Dep. at 39; Lang Dep. at 14; Lang Aff. ¶ 3.

■ MCII contends that plaintiff cannot establish a *prima facie* case as to Lee because there was only one similarly situated employee, Joseph Volz, who was retained and that Volz is older than Lee. Plaintiff claims that, in addition to Volz, other members of the engineering group to which Lee belonged were also similarly situated. Those employees in Lee's group that plaintiff categorizes as similarly situated, Steven Lubash, Gregory Brinton, Abraham Chait, and Susan Tobey, are software engineers or software programmers. Lang Dep. at 22–24; Mair Dep. at 31. While Lee's affidavit is crafted to indicate that he did some software programming, he cannot be considered similarly situated with employees who performed only software programming functions. Moreover, although there is evidence which indicates that Tom Chin, age 45, Ben Hecksher, age 21, and David Summerland, age 26, who worked for MCII prior to the acquisition, performed the same function as Lee, this evidence is unavailing given this court's lack of confidence in the proposition that the acquiring company's employees should be placed in the mix of employees of the company being acquired for purposes of determining who is similarly situated. The retention of these employees while Lee was laid off is not sufficient to satisfy the *prima facie* requirement.

■ But even had a *prima facie* case been established on behalf of Lee, MCII cites Lee's poor performance as a legitimate, nondiscriminatory reason for laying him off. Mair Dep. at 47–48, 52, 98–99; Lang Dep. at 44–49, 86. Plaintiff has come forward with evidence which could indicate that this reason is unworthy of credence. Lee's personnel form indicates that he was recommended for reemployment. Pl.Trial Exh. 20. In addition, Lang wrote a positive letter of recommendation for Lee. Pl.Trial Exh. 397. *See Chipollini*, 814 F.2d at 901 (positive letters of recommendation written for employee terminated for poor performance are evidence which could support a finding of pretext). Indeed, Lang stated in this letter that Lee's layoff was "not due to any fault on his account, but a result for [sic] reduction in staff due to a merger of the Company". *Id.* Even if this evidence casts doubt on MCII's proffered reasons, and the court will assume for purposes of this motion that it has, plaintiff has presented nothing which would indicate that discrimination on the ground of age was the real reason. Summary judgment is appropriate as to Lee's claim.

#### 5. *John Sharp*

■ John Sharp was laid off from his position as the supervisor of the Safetran computer system in May, 1988 at the age of 47. Stip. ¶¶ 269–271, 273. At the time of the acquisition, the technical supervisors for Safetran were Sharp, Nelson Caro, age 43, and Victor Torres, also age 43. McKenna Dep. at 9. MCII argues that plaintiff cannot make out a *prima facie* case with respect to Sharp because when Sharp was laid off in May, 1988, the two technical supervisors retained at that time, Caro and Torres, were only four years younger than he. MCII urges that the four year age difference is insufficient to give rise to an inference of discrimination.

In an attempt to rebut MCII's argument, plaintiff contends that the similarly situated employees with whom Sharp should be compared include, in addition to Caro and Torres, the operations supervisors: Amalia Almario, age 37; Leslie Sturt, age 27; Joseph Antoci, age 34; and Philip Ahern, age 46. However, technical supervisors and operations supervisors, while in the same department, did not perform the same functions. Caro Dep. at 27–30. Nelson Caro, a technical supervisor, testified that an operations supervisor would not be able to do the

entire job of a technical supervisor. *Id.* at 30. Plaintiff's argument that the operations supervisors and technical supervisors were similarly situated for purposes of showing a *prima facie* case must be rejected.

Plaintiff next argues that even if only Caro and Torres were similarly situated employees, it has established a *prima facie* case as to Sharp because the four year age difference between Sharp and Caro and Torres is sufficient to make out this element of a *prima facie* case. Plaintiff relies, incorrectly, on *Bruno v. W.B. Saunders Co.,* 882 F.2d 760, 764–65 (3d Cir.1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 880, 107 L.Ed.2d 962 (1990), for this proposition. The Third Circuit held in *Bruno* that the age difference between the plaintiff, who was age 46, and her replacement, who was age 36, was sufficient to permit an inference of age discrimination. *Id.* at 765. The court relied heavily on the fact that the plaintiff was within the protected class while the replacement was not, and distinguished that situation from the one presently before the court, in which both plaintiff and the younger employees who plaintiff claims have received more favorable treatment are within the protected class, noting that such a situation had been addressed in *Maxfield. Id.* It concluded that in the *Maxfield*-type situation "we found it necessary to examine the magnitude of the age difference in order to determine whether it would support an inference of discrimination." *Id.*

In *Maxfield,* the plaintiff was age 65 and the replacement was age 42. The court rejected the proposition that such an age disparity could not support an inference of discrimination where both persons were within the protected age category. *Maxfield,* 766 F.2d at 793. In considering the policy rationale for rejecting a narrower reading of the *prima facie* case requirement, the court noted that such a construction would render the ADEA virtually useless to those in the upper ages of the protected class. *Id.* at 792. Obviously Sharp, at age 47, is not the type of plaintiff contemplated by the *Maxfield* court. Moreover, it is telling that the example used in that case by the appellant-employer to illustrate the supposed evils of recognizing *prima facie* cases where both employees were within the ADEA's protected class was that a deluge of 45 year old employees replaced by 48 year old employees would flood the courts. The court described this suggestion as "frivolous", and observed

> Moreover, we see little basis for any concern that replacement by a slightly younger employee will give rise to an ADEA claim, since proof of replacement by a younger person is not conclusive of discrimination but is merely one element in a set of circumstances that may give rise to an inference of discrimination. If the difference in ages of the two employees is insignificant, the district court would likely find that the evidence was insufficient to permit an inference of discrimination.

*Id.* at 793.

Under *Bruno* and *Maxfield,* the four year age difference between Sharp and those similarly situated who were retained at the time he was laid off, Caro and Torres, is insufficient for purposes of the *prima facie* case. Summary judgment is, therefore, appropriate as to the layoff claim raised on behalf of Sharp.

### 6. *Nelson Caro*

Although Nelson Caro was retained when James Sharp was laid off at the time of MCII's acquisition of RCAG in May, 1988, he was terminated from his position as a supervisor in the Centralized Computer Systems ("CCS") Department in September, 1988 at the age of 43. Stip. ¶¶ 78–80, 82. After the acquisition, MCII consolidated the Safetran system with the CTE system to create the CCS. McKenna Aff. ¶ 4. As a result of this consolidation, the two technical supervisors from Safetran, Caro and Torres, were combined with the technical supervisors from CTE, Eligio Briones, age 44, and Charles Rayside, age 41. McKenna Aff. ¶ 4; Pl.Trial Exh. 162 at 5998. Just as with Sharp, MCII contends that plaintiff cannot establish a *prima facie* case of discrimination because of the three technical supervisors retained, one was older than Caro, one was the same age, and one was two years younger. As it did with respect to Sharp, plaintiff maintains that the operations supervisors should be

similarly situated. For the reasons previously expressed, the court rejects that argument. Plaintiff's remaining argument, *i.e.,* that the two year age difference between Caro and Rayside is significant enough to permit an inference of discrimination, is even more attenuated than was the argument with respect to Sharp. In short, the two year age difference does not support a *prima facie* showing and MCII's motion for summary judgment with respect to Caro's layoff claim is granted.

### 7. *Philip Ahern*

Philip Ahern was laid off from his position as a computer analyst in February, 1989 at the age of 46. Stip. ¶¶ 31–32, 34. Ahern's job responsibilities included supervising tape librarians, tape and disk media backups, and acting as a relief supervisor on the computer floor. Ahern Dep. at 17. MCII argues that summary judgment is appropriate as to Ahern's claims because his position was the only one of its kind and, therefore, when it was eliminated no similarly situated employees were retained. Plaintiff does not seriously challenge the assertion that Ahern's position was eliminated, and the evidence indicates that Ahern's duties were absorbed by others. McKenna Aff. ¶ 7; Ahern Dep. at 27.

Rather, plaintiff's claim seems to be that Ahern was discriminated against by not being transferred to an opening for a floor supervisor. At the time Ahern was advised that his position was being eliminated, he was given 30 days within which to seek a new position within the company. Ahern Dep. at 31. The only internal opening for which he felt he was qualified was the position of floor supervisor and, accordingly, he posted for that position, but was not selected. *Id.* at 29–31. Rather, David Gutierrez, age 29, was transferred from the Fort Lee, New Jersey facility to fill the open position. Plaintiff has satisfied this element of the *prima facie* case insofar as it has shown the failure to transfer

Ahern to the opening in favor of transferring Gutierrez.[12]

MCII claims that it filled the floor supervisor position with Gutierrez rather than Ahern because Ahern lacked enthusiasm for floor supervisor work and did not have strong technical and operational skills. Patrick McKenna, Ahern's supervisor, testified that Ahern told him that he did not want the job of floor supervisor and McKenna thought that Ahern was simply trying to avoid being terminated. McKenna Dep. at 30–31. In addition, McKenna noted that the supervisor's position could entail some duties which Ahern would not be able to perform because of his lack of technical ability. McKenna Dep. at 58. In contrast, McKenna stated, Gutierrez was a highly rated supervisor at the Fort Lee facility, although he later had performance problems in the new position at Piscataway and eventually transferred out because, in McKenna's opinion, he could not adjust to the Safetran environment. McKenna Dep. at 118. MCII has met its burden of production in setting forth legitimate, nondiscriminatory reasons for not placing Ahern in the floor supervisor position.

Plaintiff has not met its burden of demonstrating a genuine issue of fact as to whether MCII's asserted reasons are, in fact, a pretext for discrimination. Plaintiff asserts that Gutierrez "had been reprimanded for countless performance problems." Pl.Opp.Br. at 18. A review of Gutierrez's personnel file reveals that his performance was rated "low excellent" for the year 1987–88; mostly "very good" for 1986, with the exception of attendance problems; and "very good high" for the period from July, 1986 to July, 1987. Pl.Trial Exh. 359. There was one performance problem in July, 1987, as well as absentee or tardiness problems in January, 1987, December, 1986, and October, 1986. Ahern's evaluation form for the period from October, 1987 to October, 1988 reveals that his performance was rated overall "low very good." Ahern Dep., Exh. 3. Thus, although there had been some absenteeism, Gutierrez was rated higher than Ahern.

---

**12.** With respect to Ahern's claim of failure to transfer or, alternatively, failure to promote, MCII argues that plaintiff has failed to exhaust its administrative remedies. This argument is subject to the same analysis as the failure to rehire and retaliation claims and is rejected for the reasons expressed by the court in its consideration of those claims. *See* Section V.A, *infra.*

Moreover, although plaintiff argues that MCII's subjective reasons for not moving Ahern into the supervisor position are themselves sufficient to indicate pretext, the personnel evaluation of Ahern bears out the reasons stated by McKenna. That evaluation describes Ahern as "less than enthusiastic" in accomplishing assigned projects as well as in taking on the added responsibility of being a relief supervisor, notes that he "tends not to exert himself beyond the basic requirements," and recommends that to improve he "must become more motivated toward accomplishing his assigned tasks." Ahern Dep., Exh. 3. Inasmuch as the subjective reasons stated by McKenna are borne out by other evidence, and nothing to the contrary is offered by plaintiff and, certainly, nothing which suggests age motivation, plaintiff's attempt to show pretext falls far short. Summary judgment will be granted as to Ahern's layoff claim.

### 8. *Louis Collorec*

Louis Collorec was terminated at the age of 50 from his position as a Senior Scheduler in the Telex Order Center in May, 1988. Stip. ¶¶ 96–98, 100. Collorec's duties included ordering telex lines and corresponding equipment and troubleshooting. Collorec Dep. at 14–15. MCII does not challenge Collorec's ability to satisfy the *prima facie* requirements of the *McDonnell Douglas* formulation. Rather, it asserts that at the time of the acquisition, it decided to phase out the job of Senior Scheduler at the Piscataway facility and selected Collorec for layoff because he was the poorest performer of the Senior Schedulers.

■ Erasmo Hernandez, Collorec's supervisor, testified that he may have complained that Collorec needed "follow-up skills," in that he did not always finish his assigned task in a given day. Hernandez Dep. at 34. Raymond Zimmerman, who supervised Collorec prior to 1987, indicated that Collorec would do only what he had to do. Zimmerman Dep. at 15. Zimmerman also remarked that he had to keep "prodding" Collorec to do his job. *Id.* at 50. Collorec's supervisors' dissatisfaction with his

performance is a legitimate, nondiscriminatory reason for his layoff.

In support of its pretext argument, plaintiff notes that the other employees performing the same function as Collorec who were retained were all younger than Collorec. MCII does not dispute this allegation but, as noted above, claims that Collorec was selected for layoff because he was the poorest performer. A mere recitation by plaintiff of the fact that younger employees were retained does not begin to show pretext; indeed, to accept plaintiff's argument would be to say that older workers should be treated more favorably than younger workers regardless of performance and that, of course, is not the law. Moreover, plaintiff has not come forward with any evidence to rebut MCII's evidence that Collorec was the worst performer of the group.

■ Finally, plaintiff's reliance on Collorec's statement that he was told by his former coworkers that after his layoff his former assistant, Dan Garber, age 25, was performing his duties is garden variety inadmissible hearsay and therefore cannot create a factual issue as to pretext. Collorec Dep. at 30, 32–33; Fed.R.Evid. 801(d)(2)(D). That aside, "[e]mployers often distribute a discharged employee's duties to other employees performing related work for legitimate reasons" without increasing or decreasing the likelihood that the former employee was discharged because of his or her age. *Frieze v. Boatmen's Bank of Belton,* 950 F.2d 538, 541 (8th Cir.1991). And, plaintiff's suggestion to the contrary, it is clear that MCII's explanations with respect to Collorec's layoff did not shift or change over time. Plaintiff having failed to raise a genuine issue of fact as to whether MCII's proffered reasons are pretextual, summary judgment will be granted on Collorec's claim.

### 9. *Joseph Fezza*

Joseph Fezza was laid off from his position as a Telex Order Acceptance Clerk in May, 1988 at the age of 59. Stip. ¶¶ 136–37, 140. Fezza's job as an order acceptance clerk was to take and analyze orders for telex service. Barnum Dep. at 34–35; Zimmerman Dep. at 43. MCII does not challenge plaintiff's abili-

ty to make a *prima facie* showing. It claims, however, that Fezza was laid off because he was a poor performer. Raymond Zimmerman, Fezza's immediate supervisor, stated that Fezza could not analyze orders or carry out the specific tasks assigned to him. Zimmerman Dep. at 43. William Barnum, Zimmerman's superior, concurred in this judgment, noting that Fezza could not do the work his job required. Barnum Dep. at 34–35.

Plaintiff claims that the reason stated by MCII is a pretext for discrimination. Plaintiff, however, has shown nothing which even hints at a genuine issue of fact which could lead a reasonable jury to conclude that the reason offered by MCII was not its true reason and that it more likely acted because of a discriminatory reason. Plaintiff has submitted nothing which calls into question Fezza's poor performance; indeed, all it has submitted as relevant to this issue is one letter of appreciation from one subscriber in 1986 (Pl. Trial Exh. 14).[13] Accordingly, summary judgment is granted as to Fezza's claim.

### 10. *Wallace Carnegie and Carl Reddo*

■ Wallace Carnegie was laid off from his position as a Supervisor of Traffic Operations at the age of 51 in May, 1988. Stip. ¶¶ 69–71, 73. Carl Reddo was laid off from the same position on the same date at the same age. Stip. ¶¶ 249–51, 253. The parties have stipulated that Andrew Carnegie, age 50, and Lucious Herring, age 48, were employees retained in comparable positions. Stip. ¶ 254. Edward Kistulenic, age 44, was the group leader. Stip. ¶ 254. In response to MCII's argument that no *prima facie* case

can be established because Andrew Carnegie and Herring are not sufficiently younger to permit an inference of age discrimination, plaintiff urges the court to consider the traffic operations supervisors from the other area facilities as similarly situated.[14] These employees were Timothy Hallahan, age 29, Robert Davis, age 50, Gerard Gordon, age 41, Catherine Altini, age 47, and Felix Vales. Stip. ¶ 65; Pl. Trial Exh. 96–98.[15] Plaintiff cites *Duffy*, 738 F.2d at 1395, as support for this proposition. In *Duffy*, however, the Court of Appeals declined to consider an argument made on appeal that the district court erred in finding a *prima facie* case by considering comparable employees in Wheeling Pittsburgh's entire Philadelphia district rather than just in its Philadelphia office because that argument had never been presented to the district court. *Id.* at 1395 n. 1. Thus, because the court did not consider the merits of the argument, *Duffy* does not directly support the proposition for which it is cited.

This court agrees, nonetheless, that the traffic operations supervisors from area facilities other than the Piscataway facility should be considered in determining whether MCII retained similarly situated employees who were younger than Wallace Carnegie and Reddo. In so agreeing, the court relies on the fact that the duties and functions of the traffic operations supervisors did not vary significantly from location to location. This is evidenced by the fact that in December, 1989, MCII consolidated the traffic operations personnel from the different facilities. *See infra.* MCII could have retained but transferred one of the older employees laid off if there were a weaker performer in a

---

**13.** Beyond P–14, plaintiff's submission on behalf of Fezza is truly paltry being only a one page excerpt from his deposition which does not even address the issue of his performance. Plaintiff attempts to argue that Patricia Shirley, who occupied a similar position and was retained, had performance problems and cites to the Hernandez deposition at pages 27 and 30, which pages it has not submitted to the court. Other pages of that deposition indicate, however, that while Shirley had problems at the beginning, they were corrected. Hernandez Dep. at 35, 37.

**14.** In addition, traffic operations supervisors Andrew Carnegie, age 50, Neil Noto, age 50, and

Jeffrey Stern, age 51, were retained at the time of the acquisition but laid off in December, 1989. Their claims are considered *infra.*

**15.** Plaintiff contends that Felix Vales was younger than Wallace Carnegie and Reddo and that he was employed in a comparable position. The record with respect to Vales, however, is at best unclear on both of these scores. It is not ascertainable whether Vales was a traffic operations supervisor at the time Wallace Carnegie and Reddo were laid off or what his age was. *See* Theodore Dep. at 48, 84.

different facility. Moreover, the court is not persuaded by MCII's argument that plaintiff is foreclosed by its stipulations from making this argument. The parties stipulated that Andrew Carnegie, Lucious Herring, and Edward Kistulenic were retained in positions comparable to Wallace Carnegie and Reddo. Stip. ¶¶ 74, 254. The court does not read these stipulations so broadly as to necessarily say that the names stipulated were those of the only employees retained in comparable positions, although that would certainly be the more likely reading. Thus, because younger employees in comparable positions were retained by MCII at the time it laid off Wallace Carnegie and Reddo, plaintiff has met its burden of showing a *prima facie* case.

MCII asserts that Wallace Carnegie and Reddo were laid off because they were the weakest performers. Vernon Wellington's affidavit indicates that he recommended Wallace Carnegie for layoff because he believed that compared to the others at the Piscataway facility, Carnegie lacked a strong understanding of the job, could not be relied on to solve problems encountered by those under his supervision, had comparatively poor supervisory skills, and was not always conscientious about fulfilling all of his job responsibilities. Wellington Aff. ¶ 5. With respect to Reddo, Wellington's affidavit indicates that Reddo had difficulty learning new technologies, a skill Wellington believed would be particularly important after the acquisition. *Id.* ¶ 6. These nondiscriminatory reasons suffice to meet MCII's burden of production, therefore shifting the burden back to plaintiff to show pretext.

Plaintiff claims that Wellington's assessment of the abilities of Wallace Carnegie and Reddo is not supported by their personnel records. The records on which plaintiff relies, however, are merely compendia of computer-generated information sheets on each employee. Far from rebutting the statements made by Wellington, at most they indicate that Carnegie and Reddo each had three salary increases between 1984 and 1987. Pl. Trial Exh. 6 and 27. Plaintiff further argues that the personnel records of Altini, Gordon, and Hallahan indicate that

these employees had performance problems. But aside from a tendency to be abrupt on occasion, Altini's performance evaluation does not indicate any problems; indeed, that evaluation was very positive, with Altini receiving a rating of "fully met" in each area as well as an overall rating of "fully met". Pl. Trial Exh. 96. Similarly, Hallahan's evaluation indicates that he received ratings of mostly "fully met" with some higher "consistently exceeded" ratings. Pl. Trial Exh. 98. The only area in which Hallahan needed improvement was in communications skills, specifically with regard to interpersonal relations, as to which it was noted that some improvement had already been demonstrated. *Id.* Although the evaluations of Gordon submitted by plaintiff indicate that there were one or two areas in which his performance was deemed to require improvement, none of these evaluations covered the period prior to the layoff of Wallace Carnegie and Reddo; rather, they are from August, 1988 or later. Pl. Trial Exh. 97. All in all, plaintiff has failed to adduce evidence which raises a genuine issue of fact that the performance-related reasons proffered by Wellington are unworthy of credence. Summary judgment is appropriate as to the claims of Wallace Carnegie and Reddo.

11. *Andrew Carnegie, Neil Noto, and Jeffrey Stern*

In late 1989, MCII merged the traffic operations of the Piscataway and Fort Lee, New Jersey facilities. At the time it merged operations, MCII laid off three traffic operations supervisors. Andrew Carnegie was laid off from his position as a supervisor of traffic operations on December 1, 1989 at the age of 51. Stip. ¶¶ 60–62, 64. Neil Noto, also age 51, was laid off from the same position on December 4, 1989. Stip. ¶¶ 223–25, 227. Jeffrey Stern was laid off from the same position on December 1, 1989 at the age of 42. Stip. ¶¶ 286–88, 290. Timothy Hallahan, age 31, Robert Davis, age 52, Gerard Gorden, age 44, Catherine Altini, age 48, and Lucious Herring, age 50, were operations supervisors that were retained. Inasmuch as Andrew Carnegie, Noto, and Stern are all in the protected age class, qualified for their positions, and younger similarly sit-

uated employees were retained, MCII does not challenge the ability of these claimants to establish a *prima facie* case; rather, the sole question is whether there is an issue of fact as to whether the reasons articulated by MCII for laying them off were pretextual.

MCII asserts that Andrew Carnegie, Noto, and Stern were laid off because they were the weakest performers among the traffic operations supervisors at the time of the consolidation, although Carnegie was better than Noto or Stern. Wellington Aff. ¶¶ 7–8; Thies Aff. ¶ 7. Wellington's affidavit indicates that, based on his observations, Noto and Stern, who worked at the Fort Lee facility prior to the merger, lacked the level of job knowledge necessary to perform their functions well. Wellington Aff. ¶ 7. Similarly, Thies' affidavit states that while Hallahan was an excellent performer, Noto and Stern were not adept at problem solving. Thies Aff. ¶ 6. The affidavit of Anthony Eccles concurs in this judgment of Noto and Stern, stating that they never completely grasped their jobs and were below all the other traffic supervisors in terms of job knowledge. Eccles Aff. ¶ 3. Charles Norris testified that he viewed Noto as a poor performer based on his experience with Noto as well as customer complaints regarding Noto. Norris Dep. at 86. With respect to Andrew Carnegie, Eccles opined that although Carnegie had a good understanding of his job, he was less demanding of the employees he supervised and was less strict than other supervisors. Eccles Aff. ¶ 4. MCII favors strict supervision. *Id.* Wellington's affidavit stated that Carnegie was a good performer with good job knowledge but that he was not as good a performer as Altini, Davis, Gordon, Hallahan, and Herring [16] and was not as good a supervisor because he was not as strict with the operators whom he supervised. Wellington Aff. ¶ 9.

Plaintiff claims that the reasons articulated by MCII are pretextual. Andrew Carnegie's personnel evaluations, it argues, are all favorable and do not indicate that he was insufficiently strict with the operators. Pl.

Trial Exh. 5. While Noto's evaluations can be read to offer some support for MCII's claims about job knowledge, they, too, are generally favorable. Pl. Trial Exh. 24. Stern's evaluations are also favorable. Pl. Trial Exh. 31. Moreover, plaintiff argues, the evaluations of Gerard Gordon, who was retained, indicate some performance problems.

No issue as to pretext has been shown. First, as a matter of undisputed fact, at the time of the acquisition, defendant determined that it was necessary to lay off three of the eight traffic operations supervisors, and all but one were within the protected age group. Therefore, by definition, at least two and perhaps three such older individuals concededly had to go. Second, even after the layoffs, four of the five remaining supervisors were in the protected age group, with only Hallahan (age 31) and Gordon (age 44) younger or "sufficiently younger" than Carnegie (age 51) and Noto (age 51), and only Hallahan younger than Stern (age 42), with Davis (age 52), Altini (age 48) and Herring (age 50) remaining. When one considers the supervisors as a group, the sheer numbers belie any inference of age discrimination. And, specifically as to Noto, who was hired at age 49 less than three years before he was laid off, Stip. ¶¶ 222, 223, 227, it is "incredible" that the same company who had so recently hired him so suddenly developed an aversion to older people. *Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 174–75 (8th Cir.1992).[17]

Defendant has offered a host of reasons for its decision to lay off Carnegie, Noto, and Stern and the reasons why it retained those it did. At first blush these reasons, to some extent subjective, appear somewhat persuasive. Plaintiff, however, for its part, has come back with the performance evaluations of the three claimants and Messrs. Hallahan and Gordon, implicitly if not explicitly recognizing that, in terms of age discrimination, it cannot credibly complain of the fact that persons older than or about the same age as the three claimants were retained to the

---

**16.** The record of this case is bereft of information relating to Herring.

**17.** . Stern, too, was hired—at age 39—less than three years before he was laid off. Stip. ¶¶ 285, 286, 290.

detriment of the claimants. Plaintiff does not suggest that these evaluations do not accurately reflect the various individuals' performance and ability.

A comparison of the performance evaluations of various individuals is certainly instructive at least for purposes of ascertaining, as a general matter, whether an employee is good, bad, or indifferent. But here, too, there is a subjective component involved and where, as here, the various evaluations have been prepared by various individuals, comparison is difficult. *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 849 (7th Cir.1992).

That having been said, when one considers only the evaluations, defendant's reasons at least insofar as they speak of Noto and Stern as being "comparatively poor performers" appear to be somewhat exaggerated. When one views the evaluations objectively, it is beyond dispute that the persons at issue here—the three claimants, Hallahan, and Gordon—all were at or about the "fully meets" overall rating but that Hallahan was better than the rest and Gordon marginally worse. Similarly, when one considers the evaluations together with defendant's affidavits, consistency is seen, with Carnegie rated as better than Noto and Stern and not nearly as high as Hallahan. There can be no inference of age discrimination when the better person retained the job. Stated somewhat differently, to suggest that Hallahan should have been laid off in favor of one of the claimants is to suggest that that claimant is entitled to more favorable treatment because of his age and, of course, he is not.

As to Gordon, defendant's affidavits indicate the belief, without specific information, that he was a better performer than the three claimants. To suggest that Gordon, who was younger only than Carnegie and Noto, and whose evaluations describe him to have "fully" met requirements albeit with some improvement in certain areas recommended—evaluations different from those of Carnegie and Noto only in degree, but not in kind, *see Healy*, 860 F.2d at 1220—should have been laid off and Carnegie or Noto retained is to put this court—or a jury—in the position of a personnel manager or a

vehicle by which close calls can be second-guessed. This is not what the ADEA is all about. *Id.* at 1216.

It is not enough for Carnegie or Noto to show that either, or both, would have been a more appropriate choice than Gordon. Similarly, "the mere fact that an older employee is [laid off instead of] a younger one does not permit an inference that the [layoff] was motivated by age discrimination". *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1413 (7th Cir.1984). Rather, evidence must be submitted to establish at least an issue of fact as to whether defendant's reason was unworthy of credence—and, here, the reason stated was simply defendant's belief that Gordon was better than Carnegie and Noto—evidence which must show that what that reason was based upon was obviously weak or implausible. *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 531 (3d Cir.1992), *petition for certiorari* filed (June 18, 1993). Plaintiff, of course, must also show a genuine issue of fact or at least a reasonable inference that discrimination was the real reason. Plaintiff has not raised any issue of fact much less a genuine issue that discrimination on the ground of age played any role in defendant's decision. Summary judgment as to the layoff claims of Andrew Carnegie, Neil Noto, and Jeffrey Stern will be granted.

### 12. *Peter Theodore*

Peter Theodore was 59 at the time he was laid off in February, 1990. Stip. ¶¶ 322 and 326. At the time of his layoff, he was the Manager of Traffic Operations at the Piscataway, New Jersey facility. Stip. ¶¶ 323 and 324. MCII asserts that Theodore cannot establish a *prima facie* case because he indicated to his supervisor that he wanted to leave MCII in exchange for a severance package. Theodore Dep. at 51–53. Plaintiff counters this argument by noting that Theodore had been told by his supervisor, Vern Wellington, that one of the three managers in his department would be laid off. *Id.* at 51. Theodore's deposition testimony indicates that he thought he could "see the handwriting on the wall" and so he let both Wellington and Wellington's superior, Richard

Thies, know that he would take a severance package and leave MCII. *Id.* at 51–53. Although Theodore did not volunteer for severance, he testified that MCII did not have a program under which employees could volunteer for severance and that the most he could do was let his superiors know that he was amenable to leaving with severance—in other words, exactly what he did. *Id.* at 52–53. Thies' deposition testimony similarly indicates that Theodore volunteered to step down in the reduction in force. Thies Dep. at 73.

Although MCII contends that Theodore's statements to Wellington and Thies prevents plaintiff from establishing a *prima facie* case as to Theodore, this court will assume the contrary, for the fact remains that Theodore was laid off, albeit after advising his supervisors that he was amenable to such a decision. Therefore, evidence discussed by the parties is more properly viewed in terms of legitimate, nondiscriminatory reasons and pretext. MCII's nondiscriminatory reason for laying off Theodore was that he had indicated his willingness to be laid off, hardly an insubstantial point. The burden then shifts back to plaintiff to demonstrate that this reason was merely a pretext for discrimination.

Plaintiff has failed to raise a genuine issue of fact in this regard. Theodore does not dispute the legitimacy of defendant's reason for laying him off. He argues only that he was not included in certain meetings concerning whether to retain or sever supervisors and that he disagreed with an evaluation which both he and his immediate supervisor, Wellington, thought should be higher. Theodore Dep. at 33–36, 46. This evidence, even viewed in the light most favorable to plaintiff, does not show a factual issue with respect to whether MCII's proffered reason was pretextual which, as noted earlier, Theodore concedes it was not. Therefore, MCII's motion for summary judgment is granted as to Theodore.

### 13. *Dominick DeCeglie*

■ Dominick DeCeglie was terminated from his position as Manager of Real Estate and Facilities Planning on October 3, 1988 at the age of 59. Stip. ¶¶ 114–16, 118. MCII argues that plaintiff cannot establish a *prima facie* case as to DeCeglie because his position was eliminated and, even assuming a *prima facie* case has been made, it has articulated legitimate, nondiscriminatory reasons for laying him off. Aside from whether plaintiff has otherwise established a *prima facie* case, MCII's argument that it cannot establish a *prima facie* case because DeCeglie's position was eliminated must be rejected out of hand. DeCeglie was the Manager of Real Estate and Facilities Planning for RCAG prior to the acquisition. DeCeglie Dep. at 22. MCII had its own real estate manager, Judy Taylor, age 37. Taylor Dep. at 11. MCII claims that after the acquisition it had two real estate managers but only needed one and that, for what it contends were legitimate reasons, it chose Taylor over DeCeglie. Clearly, given its retention of Taylor as real estate manager, this is not a situation in which the position of real estate manager was eliminated altogether, as MCII seems to suggest.

In any event, MCII misses the boat in making this argument. DeCeglie's claim is not that he, not Taylor, should have been chosen for real estate manager although, assuredly, he would agree with that proposition but, rather, that he was laid off because of his age. It is as to the layoff that plaintiff has failed to establish a *prima facie* case.

Some background is in order to place DeCeglie's claim in context. Taylor was doing a "very good job" as MCII's real estate manager prior to the acquisition, Ottman Aff. ¶ 4, while DeCeglie's performance was viewed by his supervisor at RCAG as "only" satisfactory. Stackhouse Dep. at 12. Moreover, DeCeglie was less suited to the position of real estate manager at MCII because the real estate operations at RCAG were less centralized than those at MCII, which meant that DeCeglie had less direct involvement with the real estate affairs at the various RCAG sites while he was manager. Ottman Aff. ¶ 3. Because of these reasons, reasons with which plaintiff does not take issue, Taylor got the nod.

Prior to the acquisition, MCII determined that it wished to retain DeCeglie for a period of time after the acquisition and until Taylor

could become familiar with RCAG's real estate operation but that he would not remain in MCII's employ any later than the end of 1988, Stackhouse Dep. at 64, a fact of which DeCeglie was advised and does not dispute. He made no secret of his displeasure at working for Taylor and Taylor testified that DeCeglie's work after the acquisition when he was under her supervision was poor, that he did not pay attention to detail or negotiate strong deals, and that he needed a lot of supervision. Taylor Dep. at 34–35, 39–40, 43–44, 55. She provided example after example of his "poor" attitude and thought that, among other things, he had a problem working for a black woman. *Id.* at 56–59.

Plaintiff asserts that because, at or about the time of DeCeglie's layoff, MCII hired 49 year old Barbara Siemer as an assistant to Taylor and Siemer assumed many of DeCeglie's duties, it has submitted sufficient evidence of pretext. Plaintiff has jumped the gun, however, for as to the layoff claim, it must first show that DeCeglie was "replaced by a person sufficiently younger to permit an inference of age discrimination". *Gray,* 957 F.2d at 1078. Siemer, at 49, was "sufficiently younger" than DeCeglie, at 59, but that is as far as it goes for it is clear that Siemer did not "replace" DeCeglie. MCII correctly asserts that Siemer was a staff assistant and not a real estate manager; indeed, DeCeglia was told by Taylor that Siemer "would be starting in the real estate department", DeCeglia Dep. at 39, at a salary $25,000 a year lower than DeCeglie's. Siemer Dep. at 14; Stip. ¶ 117. All that DeCeglie can offer in terms of whether he was "replaced" by Siemer is that he was told by Taylor when Siemer started that she would take over all of his projects and that he was to turn over those projects to her. DeCeglie Dep. at 39. This, if true, was hardly surprising given the vacuum which had to be filled. Thus, while there was some overlap in their job functions, and while the court will assume that Siemer took over DeCeglie's projects at least for a time, it cannot be said that Siemer "replaced" DeCeglie for purposes of establishing a *prima facie* case.

But assuming that a *prima facie* case has been established, the record is bereft of evidence of pretext. All plaintiff raises, in this regard, is what it describes as contradictions in the statements of MCII employees as to when and why the decision to terminate DeCeglie was made. The "contradictions" are these: (1) In September, 1988 DeCeglie received what on its face is a form letter from the Director of Human Resources advising him that he was being laid off as a result of the reduction in force, *see* DeCeglie Dep., Exh. 14; (2) Robert Ottman testified that he told Don Stackhouse, DeCeglie's supervisor at RCAG, that MCII would need DeCeglie only "for a period [of] time" after the acquisition; and (3) Ottman testified that DeCeglie's termination was due to the fact that Taylor believed him to be a chauvinist and a racist and because of his poor performance. Ottman Dep. at 29–31. Parenthetically, Taylor met with DeCeglie to advise him that "it's not working out" and that his services would not be required after September 30, 1988. DeCeglie Dep. at 40. The net result is that DeCeglie was laid off three months earlier than he had expected.

The only "contradiction" here is that the Director of Human Resources did not advise DeCeglie that he was fired instead of the subject of a reduction in force. There is no "contradiction" that he could have stayed until December 1988 had he satisfactorily performed, and there is no dispute that he did not satisfactorily perform; indeed, in those excerpts of his deposition with which the court has been provided there is not so much as a conclusory allegation that, following the acquisition, his performance was even acceptable.

There is no evidence of pretext. Accordingly, summary judgment must be granted as to DeCeglie's layoff claim.

### 14. *Donald Moran and Alan Wagner*

Donald Moran, age 54, was laid off from his position as Manager of Office Services in October, 1989. Stip. ¶¶ 215–16, 219. At the same time, Alan Wagner was laid off from his position as a Supervisor of Office Services at the age of 40. Stip. ¶¶ 339–40, 343. At the time MCII acquired RCAG in May, 1988, Moran was age 53 and Wagner was approximately 39. In his position at RCAG prior to

the acquisition, Moran was responsible for policy and procedures, the in-house print shop, mail services, records management, and office equipment management. Moran Dep. at 25. As a supervisor of office services, Wagner supervised a crew of six employees who performed housekeeping, moving, and repair and maintenance work. Wagner Dep. at 11–12, 15. MCII claims that although it already had personnel performing the functions of Moran and Wagner at the time of the acquisition, it nonetheless retained them in order to view their performance. Scanapico Dep. at 66.

The parties dispute what became of the duties performed by Moran and Wagner following their layoff. MCII maintains that Fred Nelson, approximately age 50, performed many of the same functions as Moran and Wagner at other facilities. Bloch Dep. at 37; Scanapico Dep. at 65–66. It claims, as well, that Shelly Bloch and Robert Trinchieri decided that the positions of Moran, Wagner, and Nelson could be consolidated into one position. Bloch Dep. at 37, 40. Nelson was retained, it claims, because of the favorable view of his job performance. Bloch Dep. at 37, 39; Scanapico Dep. at 11, 65, 74. From this, MCII argues that neither Moran nor Wagner can establish a *prima facie* case of age discrimination—Wagner because he was approximately ten years *younger* than Nelson, the employee who was retained, and Moran because he was only four years older than Nelson, an age difference insufficient to permit an inference of age bias. Moreover, MCII asserts that the layoff decision was made based on the performance of Moran and Wagner vis-a-vis Nelson and that there is no evidence that its stated reason is pretextual.

Not surprisingly, plaintiff views the evidence differently. With respect to the *prima facie* case, plaintiff disagrees that the only relevant employee with whom to compare Moran and Wagner is Nelson. Rather, it argues that Moran's duties, while taken over in part by Nelson, were also taken over by Shelly Bloch, age 31. Bloch indicated that she assumed Moran's job of overseeing the print shop. Bloch Dep. at 57. In addition, she noted that Vicky Barone, age 27, took

over equipment management. Bloch Dep. at 57. Nelson assumed Moran's mail room oversight and records maintenance responsibility. Bloch Dep. at 42; Moran Dep. at 69. Even were the court inclined to say that a *prima facie* case would not be established with respect to Moran if Nelson, four year younger, took on all his responsibilities, the assumption of substantial portions of Moran's duties by significantly younger employees would be sufficient to constitute a *prima facie* showing as to Moran.

■■■■ MCII states that it laid off Moran because his performance was not as good as that of Nelson. Plaintiff, however, states that that reason is unworthy of credence because Ottman asked Moran why he wanted to apply for a promotion when he was so close to retirement age, Moran Dep. at 43–44, and Lisa Scanapico, who was Moran's supervisor for a time, allegedly inquired about his retirement eligibility under the RCA plan, *id.* at 65–66, although Scanapico denies having asked such a question. Scanapico Dep. at 61. Asking an employee if he or she plans to retire is not, however, evidence of unlawful conduct. *Gustovich,* 972 F.2d at 850. In any event, plaintiff has come forward with nothing which would indicate that Nelson was not the better performer.

■■■■ With regard to Wagner, plaintiff likewise contends that his duties were assumed in part by younger employees. The evidence indicates that Nelson took over the lion's share of Wagner's responsibilities, *i.e.,* the supervision of the maintenance or "handyman" staff, Scanapico Dep. at 68, a fact admitted even by Wagner. Wagner Dep. at 98. Although defendant, perhaps inadvisedly, admitted in an answer to one of plaintiff's interrogatories that Wagner's responsibilities were taken over by Nelson and Bloch, Pl. Trial Exh. 165 at 12, neither party has identified any specific duties of Wagner that were assumed by Bloch. Likewise, the fact that Bloch testified that Debbie Valli, age 26, took over some responsibility for tracking the invoices of outside vendors is unpersuasive. Bloch Dep. at 59; Scanapico Dep. at 68–69. It is not at all clear from the testimony cited that there was any overlap between Valli's job and Wagner's job. Even

viewing every reasonable inference in favor of finding job overlap between Valli and Wagner and Bloch and Wagner, as the court must in a motion for summary judgment, it is plain that the vast majority of Wagner's job responsibilities were assumed by Nelson, a man approximately ten years older than Wagner. Under these circumstances, plaintiff cannot establish a *prima facie* case as to Wagner.

Summary judgment will be granted as to the layoff claims of Moran and Wagner.

### 15. *Dorothy Unger*

■ Dorothy Unger was laid off from her position as an Engineering Assistant in May, 1988 at the age of 61. Stip. ¶¶ 331–33, 335. Unger was in charge of the engineering library at RCAG's Piscataway, New Jersey facility, and her duties included the acquisition of books and periodicals. Unger Dep. at 35. MCII argues that plaintiff cannot establish a *prima facie* case of discrimination because it eliminated the position of engineering librarian when it laid off Unger. MCII did not have a centralized engineering library. Scanapico Dep. at 40. Rather, each specific engineering department was responsible for acquiring and maintaining its own reference books and periodicals. *Id.* at 41. Because MCII did not want to switch to a centralized engineering library, Unger's position was eliminated and she was laid off. *Id.* at 41–42.

Plaintiff's only response to the uncontroverted evidence that Unger's position was eliminated is MCII's supplemental answer to an interrogatory which answer states that "Upon acquisition, [Unger's] position was eliminated. To the extent that any duties associated with the Engineering Library existed subsequent to acquisition, they were performed by Ina Garwood (DOB: 6/19/27) under the direction of Eloise Glasgall (DOB: 11/21/33), MCII Technical Training Department." Aside from construing this statement as inconsistent with the position that Unger's position was eliminated, plaintiff has come forward with nothing which casts doubt on MCII's claim that it did, in fact, eliminate Unger's position. Both Glasgall and Garwood were in the training department.

After the acquisition, Glasgall performed duties that had previously been performed not by Unger but by Jack Gold. Norris Aff. ¶ 3; Stip. 159. The only other argument made by plaintiff in this regard is that MCII hired Brenda Duncan, age 34, in August, 1988 to perform duties similar to those performed by Unger. Pl. Trial Exh. 157, 164. The evidence cited by plaintiff, however, is not supportive of its argument. Rather, that evidence indicates that Duncan was hired for the position of International Coordinator in August, 1988. Pl. Trial Exh. 164. There is nothing which indicates that Duncan's duties were even remotely related to those performed by Unger. Thus, plaintiff having failed to establish a *prima facie* case as to Unger, summary judgment will be granted with respect to her layoff claim.

### 16. *Bruce Bowen*

Bruce Bowen was laid off from his position as the Supervisor of Records Management and Procedure for RCAG in May, 1988 at the age of 44. Stip. ¶¶ 54, 56; Bowen Dep. at 17. Bowen had responsibility for developing and writing policies and procedures for RCAG company-wide. *Id.* at 18. Two people reported to him with respect to records management. *Id.* In addition, at the time of the acquisition, Bowen was involved in a special project involving writing systems documentation for the engineering department. *Id.* MCII asserts that plaintiff cannot meet the requirements of a *prima facie* case with respect to Bowen.

MCII generally followed the corporate policies and procedures set down by its parent company. Scanapico Dep. at 30–31. Moreover, policies and procedures at MCII were not devised and documented in one centralized location but were devised and documented separately by each department. *Id.* MCII maintains that because Bowen was responsible for a function at RCAG which MCII did not perform, it eliminated his position and laid him off. *Id.* at 31–32. MCII claims, as well, that no one at the Piscataway facility assumed a role similar to Bowen's after his layoff. *Id.* at 39.

Plaintiff argues, first, that Bowen was never told that his job was being eliminated but

thought that he would be retained.[18] This is not relevant to the issue of whether Bowen's position was or was not eliminated. Nor is it relevant that Bowen's supervisor was supposedly shocked that he was laid off. Bowen Dep. at 30. Second, plaintiff contends that Bowen's position was not truly eliminated but that Shelly Bloch continued to fill the same function. The evidence does not support this contention. Bloch's evaluation, which plaintiff looks to for support, indicates that Bloch was responsible for the administration of MCII's Rye Brook, New York facility and that, as part of her duties, she made policies and procedures. Pl. Trial Exh. 84. This does not equate with Bowen's company-wide position and does not suffice for purposes of rebutting, in any sense, MCII's claim that Bowen's position was eliminated. Therefore, summary judgment will be granted as to Bowen's claims.

### 17. *John Andres*

John Andres, who was hired as Supervisor of Security at MCII's Piscataway and Fort Lee facilities in November, 1988 at the age of 57, was laid off from that position at the age of 58 in April, 1990. Stip. ¶¶ 37–39, 42; Andres Dep. at 14–15. Andres was responsible for directing the uniformed security force of an outside contractor employed by MCII. Andres Dep. at 16. In addition, Andres was charged with maintaining and acquiring all security related equipment in the facilities, including locks, alarms, security cameras, and a security computer. *Id.* at 16–17. MCII maintains that plaintiff cannot make out a *prima facie* case as to Andres because his position was eliminated and no one took his place. That aside, it asserts that it laid off Andres for legitimate reasons related to his performance.

■ Plaintiff has adduced sufficient evidence to establish a *prima facie* case. After MCII laid off Andres, it is undisputed that much or all of his job was performed by Margaret Ortiz, who was an employee not of MCII but of an outside security firm. Suto Dep. at 30–31; Andres Aff. 2. MCII asserts that plaintiff's *prima facie* requirement is not met by showing that an employer hired an outside contractor to do the work previously performed by the laid off employee, even where the outside person is substantially younger than the laid off employee. *See Colizza v. United States Steel Corp.*, 49 F.E.P.Cas. (BNA) 779, 785–86, 1989 WL 407241 (W.D.Pa.1989); *Talluto v. RCA*, 743 F.Supp. 346, 350 n. 3 (M.D.Pa.1989). While *Talluto* lends some support to MCII's argument, *Colizza* can be read as cutting in favor of plaintiff. The court in *Colizza* found that the plaintiff had failed to establish a *prima facie* case where plaintiff had been replaced by outside contractors. The court explicitly relied, however, on two factors which render *Colizza* distinguishable from this case. The court found, first, that where the employer had no control over which of the outside contractor's employees would do the work and, second, where there was no evidence that the outside contractor's employees were actually younger than the plaintiff, the *prima facie* requirements had not been met. *Colizza*, 49 F.E.P.Cas. (BNA) at 786. By contrast, Andres' affidavit states, albeit in conclusory fashion, that Ortiz was in her late thirties and that MCII was able to request that Ortiz be assigned to work at MCII. Andres Aff. ¶¶ 2–3. While this evidence is hardly ringing, it is sufficient to establish a *prima facie* case.

MCII argues, however, that Andres was laid off because his performance was poor. Andres' supervisor, Stephen Suto, who was unskilled in security matters and had just taken over responsibility for security when Andres started, stated that he became increasingly dissatisfied with Andres' performance as he became more knowledgeable in the area of security. Suto Dep. at 14. Suto spoke to Andres about the shortcomings in his performance and rated him "needs improvement" in the areas of planning, decision

---

**18.** Plaintiff cites pages 24–25 and 29–30 of Bowen's deposition testimony as support for this proposition. Of these pages, only page 30 has been submitted to the court. Even assuming that the referenced pages support the factual proposition for which they are cited, however, they are not relevant to the issue of whether Bowen's job was or was not eliminated. Therefore, plaintiff's omission of these pages presents no impediment to deciding the question of whether plaintiff has established a *prima facie* case as to Bowen.

making, and knowledge of work, although Andres was rated overall as "fully met" in this evaluation. Suto Dep. at 15, 21. Moreover, in March, 1990, Suto wrote a memorandum memorializing the substance of a discussion he had had with Andres about Andres' performance problems. Suto Dep. at 35–36, Exh. 2. The memo delineates numerous areas of deficiency in Andres' performance and notes that although they had been the subject of previous performance evaluations, they had not been corrected. *Id.* Based on these factors, Suto made the decision to lay off Andres. Suto Dep. at 29–30; Trinchieri Dep. at 42–43.

As evidence of pretext, plaintiff points out that Andres was rated as "fully met." Suto Dep. at 21. The mere fact that Andres was given this overall rating while concededly being rated low in some categories is not enough to create a factual issue as to pretext. Plaintiff also relies on Andres' deposition testimony in which he states that Robert Trinchieri, Suto's superior, said to him that it had not been decided whether he would be terminated outright or just given an assignment that would be impossible to complete. Andres Dep. at 64. Trinchieri's statement may indicate many things, but it does not advance Andres' age discrimination claim one iota. And, most importantly, as discussed *supra,* it defies belief, much less creates an issue as to pretext, that when one is hired, as Andres was, at 57 and laid off at 58 his employer suddenly developed an aversion to older people. Summary judgment will be granted as to Andres' layoff claim.

### 18. *Stephen Safka*

Stephen Safka was laid off from his position as Senior Member of the Engineering Staff in May, 1988 at the age of 47. Stip. ¶¶ 259–61, 263. Safka's job of plant maintenance at the Piscataway facility included supervising six technicians who performed maintenance work. Safka Dep. at 28. MCII's half-hearted argument that plaintiff cannot satisfy the elements of a *prima facie* case as to Safka because one of the employees retained was only six and a half years younger than Safka while the other was older than Safka must be rejected. Such a holding

would read the *prima facie* requirement too narrowly.

■ The parties have stipulated that MCII retained two employees in comparable positions: Gerard Doherty, who was 51 at the time of Safka's layoff, and Thomas Mauro, who was 41 at the time of the layoff. Stip. ¶ 266. In addition, Robert DiGiovanni, who was the same age as Doherty, was made the head of the facilities management department. DiGiovanni Aff. ¶ 3. Prior to the acquisition, Safka and Mauro were both responsible for supervising plant maintenance at the Piscataway facility's two buildings, Mauro primarily for the operations building and Safka primarily for the administration building. *Id.* MCII claims that Safka was laid off because his job was combined with Mauro's job and Mauro was more highly regarded, *id.* ¶ 4, and cites a computer printout of Mauro's last four performance ratings, three of which were "T" for tops. Previte Aff., Exh. 2. William Klatt, who had been Safka's department head, testified that "Steve didn't do very much. His functions were limited." Klatt Dep. at 44.

In support of its argument that MCII's reasons are pretextual, plaintiff notes that Safka's performance was rated "effective" for the years 1983 through 1985 and "satisfactory" in 1986 and 1987. Pl. Trial Exh. 28. In addition, Alan Wagner, who was 39 at the time Safka was laid off, testified that when Safka was laid off, his work was "dropped onto my lap." Wagner Dep. at 41. MCII counters that Wagner was also more highly rated than Safka. Wagner's performance from 1987 to 1988, albeit on a different rating system or scale, was rated an overall "high very good," with individual ratings of either "very good" or "excellent" in each individual category. Scanapico Dep., Exh. 7. Plaintiff argues further that Dennis Castelli, age 43, was retained in the same department as Safka when Safka was laid off. Stip. ¶ 267. Plaintiff has failed to produce evidence of what Castelli's job functions entailed but makes a bald assertion that "[o]ther younger employees were also retained in Mr. Safka's department to perform his duties, including Dennis Castelli, age 43." Pl. Opp. Br. at 33. There is absolutely no evidence of record to

support the assertion that Castelli assumed any of Safka's duties.

Finally, plaintiff argues that a factual issue exists as to whether MCII's stated reason was its actual reason because Charles Norris indicated that Klatt made the recommendation to lay off Safka, while Klatt stated that he did not make that decision. Norris Dep. at 36–37; Klatt Dep. at 43. Although plaintiff would have the court read *Chipollini* to say that this dispute, perhaps in memories, some years after the layoff is, standing alone, a sufficient basis upon which a reasonable factfinder could conclude that MCII's reasons are pretextual, the court declines to adopt such an unreasonably broad reading of *Chipollini* or of Third Circuit law generally. Based on the evidence now before the court, a reasonable trier of fact could not conclude that the legitimate business reasons articulated by MCII are unworthy of credence. Therefore, summary judgment is appropriate as to Safka's layoff claim.

### 19. *Faye Jahr*

In May, 1988, Faye Jahr was laid off from her position as a Senior Product Trainer at the age of 52. Stip. ¶¶ 172–73, 175. In her position as Senior Product Trainer in RCAG's marketing department, Jahr designed new product packages and programs, updated old programs, and made presentations of products and services. Jahr Dep. at 66. Jahr and Candice Cama, whose title was Program Development Specialist, worked for Rita Nave, RCAG's Manager of Sales Training. Pelszynski Dep., Exh. 11. Cama was 32 years old and Nave was 49 years old at the time of the acquisition. MCII retained Cama while laying off Jahr, and does not dispute that Jahr can establish a *prima facie* case. The inquiry, therefore, is limited to whether MCII has articulated legitimate reasons for laying off Jahr and, if so, whether plaintiff can demonstrate that there is a factual issue as to whether those reasons are a pretext for discrimination.

MCII asserts that it retained Cama because she was more highly regarded than Jahr. Prior to acquiring RCAG, MCII had a sales training unit of its own which was comparable to RCAG's department. Bohm Aff. ¶ 2. Jaclyn Bohm, MCII's Sales Training Manager, was told at the time of acquisition that she could increase her staff by one person. *Id.* ¶ 3. Completely satisfied with her department at MCII, Bohm was left to choose between Jahr and Cama for the open spot in her department. *Id.;* Daniele Aff. ¶ 3. Cama, who had been working at RCAG only two years at the time of the acquisition, had previously applied for a position at MCII and been made an offer of employment by Bohm. Bohm Aff. ¶ 4; Daniele Aff. ¶ 4; Pl. Trial Exh. 162. The affidavits of both Bohm and Dominick Daniele, Bohm's supervisor at the time, indicate that because they previously had been very favorably impressed with Cama, their immediate inclination was to select her over Jahr but that, despite this initial reaction, Bohm spoke to Daniele, who, in turn, spoke to Nave to get her assessment of both Cama and Jahr. Bohm Aff. ¶ 5; Daniele Aff. ¶¶ 4, 5. Daniele's affidavit indicates that Nave told him that Cama was a good employee and clearly the better of the two, *id.* at ¶ 5, a statement which if offered for its truth would be hearsay and inadmissible and if not offered for its truth but merely to show what Daniele was told and, in part, relied on, would not be hearsay. But even without the statement of what Nave told Daniele about Cama and Jahr, however, MCII has met its burden of production by articulating a legitimate, nondiscriminatory reason for retaining Cama and laying off Jahr.

Plaintiff contends, however, that MCII has given different reasons for laying off Jahr throughout discovery and that this is sufficient to raise an issue as to pretext. Plaintiff states that MCII first identified Christine Davis and J. Hickman as employees retained in comparable positions. Pl. Trial Exh. 165 at 5. The fact that these two employees were identified as being comparably employed, whether accurately or mistakenly, certainly does not bear on the issue of whether MCII's stated reasons as to Jahr are pretextual. Plaintiff next argues that MCII initially stated that the reason that Jahr was laid off was that she refused to relocate. Pl. Trial Exh. 167 at 3. This, too, has little or no probative value with respect to pretext pro-

viding, as it does, merely an additional reason for layoff. Finally, plaintiff argues that Jahr was consistently rated an "effective" performer, a fact which is not disputed. Pl. Trial Exh. 18.

Plaintiff has the burden of producing *something* which would enable the court to conclude that an issue of fact has been raised that defendant's explanation of its action was false and that discrimination was the real reason. Plaintiff has produced nothing, and summary judgment will be granted as to Jahr's layoff claim.

### 20. *Jack Gold*

Jack Gold was laid off from his position as Manager of Technical Training in May, 1988 at the age of 65. Stip. ¶¶ 154–56, 158. Gold, who was the only one in his position at RCAG, was responsible for the training and continuing education of engineers. Gold Dep. at 31–32. At the time of the acquisition, MCII employee Eloise Glasgall, age 54, served in a similar capacity at MCII. Stip. ¶ 159. MCII does not challenge plaintiff's ability to make a *prima facie* showing as to Gold but, rather, contends that plaintiff cannot demonstrate that MCII's proffered reasons are pretextual.

■■■ MCII claims that Gold was laid off because he was deemed to be less effective than Glasgall. Charles Norris, Director of Network Operations at MCII, determined at the time of the acquisition that MCII did not need to retain the services of two training managers. Norris Aff. ¶ 3. Norris was familiar with Glasgall's technical training program and considered it "highly effective." *Id.* Although William Klatt, Gold's supervisor, viewed Gold as a poor performer and felt that Gold was not meeting the requirements of his position or getting the most out of his subordinates, *see* Klatt Dep. at 32–33, Norris did not base his decision to lay off Gold on the recommendation from Klatt. Norris Dep. at 39.[19] Rather, Norris testified, he based his decision as to Gold on two meetings that he had with Gold, on discussions that he had with RCAG employees relating to the quality of Gold's training program, and on his knowledge of Glasgall. *Id.* In short, MCII contends that Glasgall was retained instead of Gold because she was a better performer. Norris Dep. at 131.

Plaintiff notes that Norris did not review Gold's personnel file or evaluations. Norris Dep. at 39. In addition, Gold was rated "effective" for each of the years from 1984 through 1987. Pl. Trial Exh. 16. Plaintiff further points out that Harry Rush, age 46, was retained in the technical training department, although it provides no evidence to show that Rush's position was at all comparable to Gold's. Pl. Trial Exh. 162. None of this evidence, standing alone or together, would create a genuine issue of fact as to pretext. Summary judgment as to Gold's layoff claim will be granted.

### 21. *Patrick McConney*

Patrick McConney, age 46, was retained at the time of the acquisition but laid off from his position as a Sales Support Representative in January, 1990. Stip. ¶¶ 196–97, 200. McConney provided training for both customers and sales representatives in New Jersey, Delaware, and parts of Pennsylvania. McConney Dep. at 28–29. There is no dispute that two sales support representatives were retained while McConney was laid off: Marybeth Joyce, age 31, and Margaret Seman, age 28. Stip. ¶ 201.

---

**19.** Plaintiff cites to pp. 34–35 of Klatte's deposition, where Klatte supposedly stated that he also listed Gold for layoff because Gold asked in May 1988 to be put on such a list. These excerpts have not been provided to the court. In any event, Gold's denial that he wanted to retire in May, 1988, Gold Dep. at 104, does not call into question Klatte's supposed statement that Gold asked to be put on the layoff list. Moreover, at the time of Gold's layoff, there was a "definite threat" that by the end of the year when Gold was due to leave the company anyway the lump sum retirement option would have been eliminated and so, Gold believed, it was a "good option" to leave the company, as he did, with severance pay to the end of the year. Gold Dep. at 45–46. Gold conceded that he had requested that his retirement date be changed to April 1, 1988, a request which was approved and which he rescinded in March, 1988 after, apparently, the requisites for retiring under the lump sum option had been liberalized. *Id.* at 81–82, 87. None of this, of course, is relevant to pretext.

■ For purposes of the *prima facie* case, plaintiff has shown that Joyce and Seman, younger employees, were retained while McConney was let go. That, of course, does not end the inquiry. As evidenced by the deposition testimony of Frank DiNoia, MCII laid off McConney for two reasons: (1) because he had a very difficult time "stepping up" to the new products, services and technology despite ample training and felt that the technology had passed him by and so would accept a severance; and (2) because Joyce was a better performer and much more competent. DiNoia Dep. at 96; Cauterucci Dep. at 66.

Plaintiff has not shown that there is anything remotely pretextual as to these reasons. McConney's performance review relating to the period from May, 1988 to May, 1989 indicates that he received an overall rating of "fully met" but that "some improvement needed" was noted in three areas. Cauterucci Dep., Exh. 2. Notably, the areas in which improvement was needed included the very areas which defendant articulated as a basis for laying him off.[20] Notably, too, at no point does plaintiff even argue that McConney was a better performance than Joyce. Moreover, it is undisputed in the record before the court that McConney approached Frank Cauterucci, his supervisor, in September or October of 1989 and said he would accept a "relatively lucrative" severance package if it could be arranged. Cauterucci Dep. at 67.[21] It was, and he did.

Nothing plaintiff submitted creates a factual dispute as to defendant's reasons being a pretext for discrimination. Summary judgment will be granted as to McConney's layoff claim.[22]

### 22. *William Terbo*

■ William Terbo was laid off from his position as a senior staff member in the Corporate Development Department in November, 1989 at the age of 59. Stip. ¶¶ 314–16, 318. MCII argues, first, that plaintiff cannot establish a *prima facie* case as to Terbo because his position was eliminated and he was not replaced and, second, that

**20.** Thus, for example, "although Pat has spent some time going over the Lotus Express package he has yet to master it. He has enough time to schedule training for himself however he does not force himself to experiment with the package . . . [W]e now have instituted some training by other support representatives to assist in his understanding". And, "Pat at times does research technical situations on his own and rectifies them. However, he should not depen[d] on others to tell him where and when to get answers. . . ." *Id.*

**21.** Although plaintiff cites the "McConney affidavit" as support for its claim that McConney did not want to be laid off, it has not submitted that affidavit to the court. In any event, even if McConney did not want to be laid off, plaintiff has not begun to show that the reasons for the layoff were a pretext for discrimination.

**22.** In the less than one page of its brief that plaintiff has devoted to McConney's age discrimination claim, it complains of yet another reason given McConney for his layoff which reason was not the "real" reason but a pretext for discrimination, a complaint worthy only of a footnote here. Thus, McConney claims that Cauterucci told him in December, 1989 that layoffs were being considered and that Joyce in the Philadelphia office would be laid off. McConney Dep. at 46. McConney further claims that Cauterucci told him that as a "consideration" to him, they would lay off Seman but that McConney would have to handle her territory in Connecticut in addition to New Jersey, which he already covered. *Id.* at 46–47. McConney states that he responded that he would not be able to handle the extra territory. *Id.* at 46–47. MCII denies that any of this occurred, *see* DiNoia Dep. at 96; Cauterucci Dep. at 69, but argues that even accepting these facts as alleged by McConney as true, plaintiff in this regard cannot establish even a *prima facie* case of age discrimination because McConney would have been retained and the youngest employee let go had he not refused to take on an additional territory. *See Spring v. Sheboygan Area School District*, 865 F.2d 883 (7th Cir.1989) (the ADEA does not outlaw changes in duties or working conditions that cause no materially significant disadvantage to an older employee). Plaintiff has not shown anything that would suggest that McConney would have suffered a "materially significant disadvantage" by taking on an additional territory and thus has not met its burden in this regard. Assuming, as the court must, the facts to be as plaintiff states, plaintiff cannot complain because McConney did not exercise his option to remain and, thus, was laid off instead of the more poorly rated Seman. *See* Pl.Trial Exh. 254. Parenthetically, defendant has not claimed, nor could it, that Seman was a better performer than McConney. In any event, aside from the mere fact of their respective ages, there is utterly no evidence of age motivation as to McConney vis-a-vis Seman.

even if plaintiff can establish a *prima facie* case, it laid off Terbo for performance-related problems. MCII's argument that plaintiff cannot meet the *prima facie* requirements under the ADEA will, in an exercise of caution, be rejected. Although MCII asserts that Terbo's position was eliminated when he was laid off, there is no dispute that younger employees who performed functions related to product development, the area in which MCII had intended to use Terbo, were retained. *See* Wernikoff Dep. at 8–14. For purposes of this motion, it cannot be said that the employees retained were not comparably employed with respect to Terbo. Therefore, plaintiff has met the requirements of a *prima facie* case.

Prior to MCII's acquisition of RCAG in May, 1988, Terbo was involved in market planning for a product called Fax Forward. Terbo Dep. at 40. After the acquisition, Terbo continued to work on the Fax Forward market plan for MCII, reporting to Sergio Wernikoff, MCII's Senior Vice President of Corporate Development. *Id.* at 43. Wernikoff stated that when Terbo was kept on in May, 1988, it was with the expectation that he would remain to work on product development for products other than Fax Forward. Wernikoff Dep. at 50.

■ In November, 1988, Terbo was rated "very good" and his evaluation stated that he did a very good job on Fax Forward and an excellent job on the Telex Directory project. Wernikoff Dep. at 62; Slocum Dep. at 63. Wernikoff testified that when it came time for Terbo to move from the Fax Forward project to other projects, however, his performance "decayed" because he was not willing to learn about existing products, thereby hampering his ability to participate in new product development. *Id.* at 69. Wernikoff placed Terbo on probation in August of 1989. *Id.* at 71, Exh. 6. In a letter memorializing the probation, Wernikoff stated that "your performance over the past year has reflected severe deficiencies in the areas of Follow-up, Initiative and Contribution, a Sense of Urgency, an [sic] an ability to Accept New Information and involve others in the organization." Wernikoff Dep., Exh. 6. The letter further stated that "[y]our performance in

the following areas [as listed above] is unacceptable and will not be tolerated further ...." and concluded "[i]f I don't see a substantial improvement in the above-noted areas within the next 60 days, I will have no alternative but to take further action up to an [sic] including termination." *Id.* Wernikoff did not see any improvement in Terbo's work thereafter, Wernikoff Dep. at 86, and Terbo was terminated on November 3, 1989. Stip. ¶ 314. For his part, Terbo disagreed with Wernikoff's assessment of his work. Terbo Dep. at 64–65. The fact that Terbo disagrees with defendant's evaluation of him, of course, does not create a factual issue as to pretext. *Billet,* 940 F.2d at 825; *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1160 (6th Cir.1990). Certainly, Wernikoff's view of Terbo's performance as substandard constitutes a nondiscriminatory reason for his layoff.

Plaintiff, in its attempt to show pretext, first claims that a younger employee in Terbo's area, George Domblaky, was retained despite performance problems. Specifically, plaintiff notes that Domblaky was rated "high improvement required" in the areas of communication and human relations in his 1986 evaluation and "some improvement required" with respect to communication in his 1990 evaluation. Pl. Trial Exh. 144. In addition, Domblaky was given a written reprimand for insubordination in December, 1990, more than a year after Terbo's layoff. *Id.* Aside from this somewhat ludicrous exercise of determining who was the worse employee, any probative value which Domblaky's performance might otherwise have is significantly diminished by the fact that it is wholly unclear what his job duties were in comparison to those of Terbo. In any event, the deficiencies in Domblaky's performance do not appear to be even close to the magnitude of those attributed to Terbo.

Plaintiff claims, second, that on numerous instances Wernikoff raised the issue of how much Terbo was being paid, although it concedes that, as to at least one of the incidents, salary was brought up in the context of Wernikoff expressing his displeasure with Terbo's work. Terbo Dep. at 213–220. Wernikoff testified that he did not think that Terbo

was earning his high salary. Wernikoff Dep. at 60–61. Randall Slocum similarly viewed Terbo as "not good for the money." Slocum Dep. at 65. Plaintiff argues that MCII's consideration of Terbo's high salary, which resulted from his thirty years experience in the field, constituted the use of salary as a proxy for age and, therefore, unlawful discrimination, citing *Metz v. Transit Mix, Inc.,* 828 F.2d 1202 (7th Cir.1987). The Seventh Circuit in *Metz* held that an employer's termination of a single employee in the protected age group and replacement of that employee with a younger, lower paid employee was not a legitimate, nondiscriminatory business reason. *Id.* at 1211. Rather, it stated that it would violate the ADEA for an employer to terminate an older employee and replace him or her with a younger, equally proficient employee merely because the older employee was earning more money. *Id.*

Whatever force *Metz* may have had before [23] has been undercut in *Hazen Paper,* in which the Supreme Court rejected the lower court's findings that an employer was liable for age discrimination when it terminated an older employee with nine years of service thus preventing his pension from vesting, which it would have, in a matter of a few weeks. The Court held that "[t]here is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age". —— U.S. at ——, 113 S.Ct. at 1705. Recognizing that pension status is typically correlated with age, the court nonetheless concluded that "age and years of service are analytically distinct" and "it is incorrect to say that a decision based on years of service is necessarily age-based". *Id.* —— U.S. at ——, 173 S.Ct. at 1706. The Court did not *preclude* the possibility that pension status may be a proxy for age but made clear, distinguishing

*Metz,* that it would not be a proxy in the sense that the ADEA makes the two factors equivalent but only in the sense that the employer may suppose a correlation between the two and act accordingly. *Id.* —— U.S. at ——, 113 S.Ct. at 1707.[24]

There is nothing which begins to suggest that Terbo's salary could be or was a substitute for age. The best plaintiff can come up with is that, while not controverting the fact that Terbo was a poor performer and conceding that on at least one instance Wernikoff brought up the topic of salary with Terbo in the context of Terbo not being worth his salary, Terbo Dep. at 214–15, on other instances Wernikoff did not *explicitly* link the subject of Terbo's salary to his substandard performance. From this, the court is told, age bias must be inferred. While all reasonable inferences must be drawn in favor of plaintiff, all *conceivable* inferences need not be. The inference of age bias from this paltry showing is not even conceivable. Summary judgment as to Terbo's layoff claim will be granted.

### 23. *Marie Chesley*

Marie Chesley was laid off from her position as a Senior secretary in June, 1988 at the age of 61. Stip. ¶¶ 87–89, 92. Chesley was the executive secretary to Phillip Sach, RCAG's Vice President of International Affairs. Stip. ¶ 90; Chesley Dep. at 43. MCII contends that Chesley's job was eliminated and she was not replaced. Although this argument is couched in terms of a legitimate, nondiscriminatory reason for laying off Chesley, it is more accurately considered an attack on plaintiff's ability to establish a *prima facie* case as to Chesley. A plaintiff whose position was eliminated and was, therefore, not replaced cannot make out a *prima facie* case of age discrimination.

---

**23.** The force of *Metz* in the Third Circuit was questionable. *See Gray,* 957 F.2d at 1087.

**24.** Because, of course, most cases can be distinguished based on their facts, even had the Supreme Court not distinguished *Metz, Metz* is distinguishable from the case before this court with respect to Terbo. *Metz* involved the replacement of a satisfactory employee with a younger worker who would do the same job for less money. The *Metz* court distinguished that scenario from one

in which an employer terminates "an older worker whose less-than-satisfactory services do not justify his salary". *Metz,* 828 F.2d at 1206 n. 7. The court noted that the District of New Jersey in *Donnelly v. Exxon Research & Engineering Co.,* 12 F.E.P.Cas. (BNA) 417, 421 (D.N.J. 1974), *aff'd mem.* 521 F.2d 1398 (3d Cir.1975), found it permissible for an employer to terminate an employee whose productivity was not in line with his salary.

Sach was a former employee of Western Union International, a subsidiary of MCII, who had retired from Western Union and gone to work for RCAG. Sach Dep. at 11. Because he was receiving a pension from Western Union and was concerned about maintaining that pension, when MCII acquired RCAG, Sach became a consultant rather than an employee of MCII. *Id.* at 11–12. He remained a consultant from May, 1988 until April, 1990, at which point he became an employee of MCII. *Id.* MCII argues that because Sach was not an employee after the acquisition, his secretary's position was eliminated. Indeed, there was no need for a secretary at all in the three person International Affairs Management Group (Chesley, Sach, and Siegmund) after Siegmund was laid off in June, 1988.

Plaintiff contends that Sach was continuously employed by RCAG or MCII and that he always had a secretary performing his work. The record does not support this contention. Sach clearly testified that he was not an employee of RCAG or MCII from May, 1988 until April, 1990. *Id.* at 11. With respect to Chesley, Sach stated that "She was my secretary. My job disappeared. The need for her job disappeared. And therefore, it is my understanding that it followed that both of us lost our jobs together." *Id.* at 17. When asked whether he offered Chesley a position as his secretary after the acquisition in May, 1988, Sach responded that he had no authority to offer her a job as an MCII employee. *Id.* at 18.

Plaintiff argues that Sach always had a secretary performing his work and that Pat Cito, age 31, filled this position. Once again, however, the record does not support this argument. Sach testified that Cito began working for him in April, 1990. *Id.* at 13. He testified that she worked for Donald Stackhouse prior to April, 1990 and that, although he shared her with Stackhouse to the extent he needed secretarial duties while a consultant, his secretarial needs were "quite minimal" and he worked mainly by himself as a consultant. *Id.* at 13, 53. He noted that he had no management control over Cito and characterized it as "purely a friendly arrangement." Sach Dep. at 51.

He answered his own phone and stated that it was possible that more than a week at a time would go by without Cito doing any work for him. *Id.* There is no factual support for plaintiff's argument that Chesley's position as Sach's secretary was not eliminated in August, 1988.

Plaintiff has adduced evidence, however, which demonstrates that other secretaries who were younger than Chesley and whose positions were eliminated in the same way that Chesley's was eliminated, i.e. the executive for whom they worked was transferred or laid off, found new positions within MCII, either in Piscataway, New Jersey or in Rye Brook, New York. Sach Dep. at 21–22; Ottman Dep. at 66–67; Codacovi Dep. at 39–40. Moreover, the record indicates that in September, 1988—three months after Chesley's layoff—MCII began to hire some executive secretaries. Pl. Trial Exh. 164. The more favorable treatment apparently given to similarly situated secretaries who were younger than Chesley could well establish a *prima facie* case and, thus, raise an inference of discrimination. The court will assume that plaintiff has established a *prima facie* case as to Chesley although, for reasons to be discussed, it has some difficulty with that assumption.

Plaintiff concedes that the reasons defendant articulated for Chesley's layoff were that her "position [was] eliminated" and that she did not wish to transfer to Rye Brook (Pl.Opp.Br. at 38). Plaintiff argues only that these reasons are contradictory, which they are not, and that Chesley was never offered the opportunity to transfer to Rye Brook. For this latter preposition it cites only Chesley's affidavit, which it has not provided to the court, and her deposition excerpts which have been provided do not address any prospective transfer to Rye Brook.

But whether or not there was a formal offer of transfer to Rye Brook, it is undisputed that there had been discussions with Chesley concerning a transfer and that she did not wish to go. Sach Dep. at 21, 40; Codacovi Dep. at 33. As a result, the personnel department was advised by defendant that Chesley was available for employment at

Piscataway, Codacovi Dep. at 33, and Sach believes it likely that he advised her to contact Human Resources to see what positions were open. Sach Dep. at 21. Plaintiff has submitted nothing which suggests that Chesley even inquired or that any secretaries who were transferred after their positions were eliminated did not inquire, and she concedes that she never reapplied after she was laid off in June, 1988. Chesley Dep. at 51. While Codacovi did not know why Chesley was not offered a position, Codacovi Dep. at 40, the only reasonable inference in the record before the court is that she did nothing to bring about an offer and there is no inference that age played any role. Particularly where an employer has suggested what employee should do to retain his or her position, that employee cannot sit back and do nothing and down the road complain that his or her layoff was because there was intentional age discrimination.

Defendant's motion for summary judgment as to Chesley's layoff claim will be granted.

### 24. *Judith Juskow*

 Judith Juskow was laid off from her position as Coordinator of Marine Services at the age of 49 in June, 1988. Stip. ¶¶ 179–80, 183. At the time of the acquisition, MCII wanted Juskow to stay on but also wanted to transfer her to the Rye Brook, New York facility from the Piscataway facility. Araujo Dep. at 40–41; Juskow Dep. at 38–39. Joseph Araujo, who was to be Juskow's new supervisor, wanted Juskow in Rye Brook where he worked because he felt that she would be working as his "right-hand person" under his direction and supervision. Araujo Dep. at 91–93. Plaintiff does not dispute that Juskow had an opportunity to maintain her position by accepting the transfer to Rye Brook. Based on this undisputed fact and the undisputed fact that no younger employee was treated more favorably, Juskow cannot establish a *prima facie* case of age discrimination because it was her own refusal to accept a transfer to Rye Brook which resulted in her layoff. *See Haimovitz v. United States Dep't of Justice,* 720 F.Supp. 516, 526 (W.D.Pa.1989) (no *prima facie* case where employee was offered a position via relocation and turned it down), *aff'd without opinion,* 902 F.2d 1560 (3d Cir.1990).

The only argument plaintiff makes to forestall summary judgment as to Juskow's claims, an argument which need not even be considered given the failure to establish a *prima facie* case, is that Juskow had been a secretary at RCAG for over twenty-nine years and had only been promoted to Coordinator of Marine Services in February, 1987, approximately a year and a half before she was laid off. Juskow Dep. at 28. After deciding that she did not want to transfer to Rye Brook, Juskow asked to be considered for positions at other MCII facilities in New York City or New Jersey, including secretarial positions. Juskow Dep. at 48, 66; Codacovi Dep. at 26. MCII did not offer Juskow another position. It is this that forms the basis for plaintiff's claim with respect to Juskow.

 This argument must be rejected. The ADEA places no affirmative duty on an employer to transfer an employee to a different position or department when that employee's position is eliminated as part of a reduction in force. *Barnes v. GenCorp Inc.,* 896 F.2d 1457, 1469 (6th Cir.), *cert. denied,* 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990); *Hill,* 729 F.Supp. at 1075–76. As the court noted in *Hill,* this is especially true where the reduction in force in company-wide. 729 F.Supp. at 1075. Juskow having turned down an opportunity to keep her position and transfer to Rye Brook, MCII had no duty to find another position for her in Piscataway or New York City.

Plaintiff having failed to demonstrate a *prima facie* case as to Juskow, summary judgment will be granted as to her layoff claim.

### 25. *Gerard Symbleme*

 Gerard Symbleme was laid off from his position as an accountant in January, 1989 at the age of 57. Stip. ¶¶ 296–97, 300. Symbleme worked in the cash applications unit, where he processed checks received, took care of the transoceanic maritime ledger and the customer accounts receivable ledger, closed accounts and transferred money be-

tween accounts, and researched misprocessed transactions. Symbleme Dep. at 51–52, 69. Symbleme was retained at the time MCII acquired RCAG in May, 1988. *Id.* at 76. There were two other accountants in the same department as Symbleme who performed similar tasks: Fannie Carter, age 43 at the time Symbleme was laid off, and Martha Demchyshyn, age 28 when Symbleme was laid off. Symbleme Dep. at 86; Pl.Trial Exh. 163. MCII claims that in late 1988, the accounting work done by Symbleme and others was transferred to union employees in order to gain the union's consent to transfer certain work to Rye Brook. Passantino Dep. at 48–52, 55. Thus, it claims, the positions of Symbleme, Carter, and Demchyshyn were eliminated because they had to be given to union employees.

At a meeting held with all nonunion collections and cash applications employees to tell them about the switching of jobs to union employees, Robert Passantino advised the employees that he was committed to finding each of them another position within the company. *Id.* at 57–58. Passantino indicated that if anyone was interested in leaving with severance he or she should speak to him. *Id.* Positions were found for Carter and Demchyshyn. Passantino Dep. at 60–61. Passantino testified that Symbleme came to him and requested that he receive severance, and never requested a transfer to another department. *Id.* at 62, 64. Symbleme testified that he repeatedly asked for a transfer instead of being laid off. Symbleme Dep. at 26, 91.

Resolving this factual dispute in favor of plaintiff for purposes of this motion, other similarly situated, younger employees, Carter and Demchyshyn, were found positions elsewhere within MCII when Symbleme was not, and a sufficient *prima facie* showing has been made. The only reason that MCII has articulated for not finding a position for Symbleme is that he requested severance rather than a transfer, the very issue he disputes. But, again, accepting plaintiff's version of the facts as true and defendant's as false, and, thus, assuming that Symbleme requested a transfer and not a severance, plaintiff has nonetheless failed to raise a genuine issue of material fact as to whether defendant intentionally discriminated against Symbleme on the ground of his age. The motion for summary judgment as to his layoff claim is granted.

### 26. *Perry Barth*

Perry Barth was laid off from his position as a supervisor in the finance department in January, 1989 at the age of 45. Stip. ¶¶ 46–48, 50. Barth's position prior to MCII's acquisition of RCAG was Leader, Cash Management. Barth Dep. at 17. His job duties included signing checks, recording by journal entry the cash that came into and left the company, dealing with banks, making wire transfers, approving all business expense reports for the New York area, managing petty cash funds for New York and Piscataway, and resolving and reconciling all differences with the RCAG's approximately fifty bank accounts. *Id.* at 18. Barth was retained by MCII after the acquisition, but MCII gradually transferred the functions Barth was performing to Rye Brook, New York. Barth Dep. at 19; Agnic Dep. at 39–43.

Nancy Schmidt, age 29, an accounting assistant in Rye Brook, assumed Barth's check generating responsibilities. Agnic Dep. at 39–40. As MCII began closing out RCAG's bank accounts, Barth's bank interface function and account reconciling functions were eliminated. *Id.* at 40–43. The reconciling of those accounts that remained was handled by Schmidt and Gelacio Tayag, both of whom had been performing that function for MCII prior to the acquisition of RCAG. *Id.* at 43. Barth's journalization duty was assumed in part by Schmidt and in part by Robert DeFreitas. *Id.* at 42. The petty cash function performed by Barth was transferred to Fort Lee, New Jersey. *Id.* at 43. Thus, by the end of 1988 most of Barth's duties had been transferred or eliminated.

Barth's supervisor from Rye Brook, Marino Agnic, testified that he "felt out" Barth to see if he would be interested in transferring to Rye Brook but never formally offered him a position because he got the impression from Barth that he would not be interested in relocating due to personal factors such as his wife's job, the fact that he owned a home

in Staten Island, and the long commute to Rye Brook. *Id.* at 34. Notably, even now Barth does not suggest that he would have gone to Rye Brook. MCII made Barth a severance offer. *Id.*

MCII contends that plaintiff cannot establish a *prima facie* case as to Barth because no similarly situated younger employees were retained instead of him. In MCII's view, Nancy Schmidt was not similarly situated because her position was more clerical than Barth's position. Agnic testified that there were no positions comparable to Barth's, characterizing Barth's expertise as "in the treasury area." Agnic Dep. at 79. Agnic did note that Nancy Schmidt worked in the treasury area, but added that her position was more clerical in nature and that Barth did not fit there. *Id.*

▮ Plaintiff disputes defendant's allegation that Schmidt was not similarly situated. While it is true that Barth's job and Schmidt's job were not entirely coterminous, Schmidt's position, as evidenced by the fact that she assumed all or part of Barth's check generating capacity, bank account reconciling function, and journalization responsibilities, was substantially similar to Barth's. For purposes of a *prima facie* case, Schmidt and Barth should be considered similarly situated. Both filled virtually the same function. Because Barth was laid off and the younger Schmidt was retained, plaintiff has established a *prima facie* case.[25]

There is no showing, however, that defendant's reason for laying Barth off was a pretext for discrimination. That reason, *i.e.,* that Barth did not wish to relocate to Rye Brook, is only challenged as "not the true reason" because Barth was not formally offered a position in Rye Brook. (Pl.Opp.Br. at 42). This is preposterous, given that plaintiff does not dispute the discussion that Agnic had with Barth to ascertain if he was interested in transferring to Rye Brook nor does plaintiff dispute that Barth was not

interested and that that was conveyed to Agnic.

Plaintiff, however, having made no showing that MCII's stated reason was unworthy of credence, nonetheless argues that "the real reason" Barth was laid off "was because of his age and his salary", citing *Metz,* among other cases, but offers nothing to show that Barth's salary was necessarily age-based or a substitute for age. For the reasons set forth in the discussion of Terbo's layoff claim in light of *Hazen Paper, supra* at 1473, summary judgment will be granted as to Barth's claim.

### 27. *Calvin Gum and George Doss*

Calvin Gum was a Senior Order Implementation Clerk and George Doss an Order Implementation Clerk in the Network Engineering Department when they were laid off in May, 1988, each at 62 years of age. Their duties entailed copying, distributing and filing engineering orders. Gum Dep. at 50. RCAG operated a centralized filing system with a central file room; MCII did not, and saw no reason, at the time of the acquisition or later, to change the system it had been using. Cyr.Aff. ¶¶ 10, 12. Accordingly, it determined to eliminate the file room jobs and Gum and Doss, the only two full-time file room employees, were laid off. Gum Dep. at 55–56. A temporary worker was subsequently called in when, on occasion, assistance in filing was needed and, even then, that worker spent almost half of her time performing secretarial duties, duties Gum and Doss had never performed. Bohack Aff. ¶ 7.

▮ Plaintiff's primary argument with reference to Gum and Doss is that their names appeared on the list of "who should stay and who should go" which Patrick prepared for his supervisor at RCAG. This court has already concluded that because plaintiff has not shown anything which suggests that the list or anything emanating

---

**25.** MCII's argument, in opposition to a *prima facie* case having been established, that it was "legitimate and nondiscriminatory for MCII to lay off Barth after many of his duties had evaporated and the remaining ones could be performed by lower level employees" is wide of the

mark. Def.Br. at 21–22. The duties performed by Barth did not "evaporate." They evaporated only insofar as RCAG no longer had to perform them separately after the acquisition. The functions were performed by MCII—mostly by Schmidt.

from the list ever found its way into defendant's hands, it is not direct evidence—or, indeed, circumstantial evidence—of discrimination by defendant.

The list aside, plaintiff has not made out a *prima facie* case as to Gum and Doss. It does not dispute that their jobs were eliminated, but argues that younger members of their department who were performing similar functions were retained. Even assuming that employees who were retained in the Network Engineering Department did some filing, and there is no evidence that any worker other than a temporary worker performed duties previously performed by Gum and Doss, plaintiff does not dispute Gum's testimony that only he and Doss performed file room duties on a full-time basis, Gum Dep. at 55–56, and there is no evidence that they were ever replaced. And if pretext even need be reached, which it need not, there is utterly no evidence that defendant's legitimate business decision to continue with a decentralized filing system was a pretext for discrimination against Gum and Doss.[26]

The motion for summary judgment as to the layoff claims of Gum and Doss will be granted.

### 28. *Peter Wu*

■■ This court need not tarry long as to the layoff claim of Peter Wu. Aside from one discussion between Messrs. Norris and Boxer which Norris remembers and Boxer does not and which, if it occurred, is irrelevant here, plaintiff predicates its claim as to Wu almost exclusively on the Patrick list, which is of no probative value for the reasons discussed earlier. The "almost" is because plaintiff also suggests that because Wu was one of the oldest employees of the Engineering Staff being 61 years of age at the time of his layoff in May, 1988, defendant's reason for the layoff—that Wu was a marginal performer and the least valuable member of his group—must be unworthy of belief.

MCII, not arguing that plaintiff has not set forth a *prima facie* case as to Wu, argues, that, indeed, Wu was a marginal performer with no unique skills, Norris Aff. ¶ 6, and the least valuable member of his group, all of whom were in the protected age group and several about Wu's age. Stip. 360. Wu's former supervisor, Joseph Fitzgerald, echoed the assessment that Wu did not have unique skills, Fitzgerald Dep. at 35, 39–40, 42, and Wu himself conceded that his Group Leader at the time of the layoff, Alexander Tonkoschkur, had been critical of his performance. Wu Dep. at 43–45, 47. He concedes, as well, albeit implicitly, that his age played no part in Tonkoschkur's opinion of him but, rather, that Tonkoschkur felt threatened by him because of his technical skills and "popularity". *Id.* at 76.

Be that as it may, there is utterly no showing that MCII's assessment of Wu's capabilities and usefulness to MCII was mistaken much less false and, indeed, plaintiff does not even refer the court to Wu's performance evaluations. The motion for summary judgment as to Wu's layoff claim will be granted.

### 29. *George Eccleston*

This court has discussed in some detail plaintiff's claim that there is direct evidence of discrimination as to Eccleston in McKenna's statement concerning Eccleston's intention to retire, and rejected it. *See supra* at 1448. Plaintiff also claims, citing *Metz,* that selecting an older employee for layoff because he earns a higher salary reflecting his greater years of experience is also discriminatory. This court has discussed *Metz* and rejected its application here in light of, among other reasons, *Hazen Paper,* and does so again. *See supra* at 1473.

Even aside from Eccleston's stated intention to retire, defendant argues that, as to Eccleston, plaintiff cannot establish a *prima facie* case because Eccleston, who was a Sen-

---

**26.** Defendant did not raise the performance of Gum and Doss as a stated reason for the layoffs. Apparently, however, it could have done so. Their supervisor, James Patrick, testified that he had caused Gum to be demoted in 1987 because of his difficulty in performing his work and issued a warning to Doss for poor attendance and tardiness. Patrick Dep. at 73–74, 78–79, Exh. 12.

ior Systems Analyst when he was laid off in May, 1988 at the age of 54, was not replaced, and no similarly situated younger employee was retained in his place. Plaintiff counters that MCII retained Dustyn Colon–Gonzalez, age 45, to assume Eccleston's duties, although plaintiff does not enlighten the court as to the nature of those duties. The record reveals, however, that while Eccleston may have believed Colon–Gonzalez was doing the same kind of work, Eccleston Dep. at 55, Colon–Gonzalez was a lead supervisor, while Eccleston was an analyst, McKenna Aff. ¶ 6, and Eccleston's project was only a part of the network package Colon–Gonzalez was writing. McKenna Dep. at 91, 118.

■ But even if plaintiff has established a *prima facie* case, Eccleston had performance problems in that he could not take pressure, and he was overpaid for the work he was doing. *Id.* at 84. Plaintiff does not dispute defendant's determination that Eccleston's performance left something to be desired—again, no performance evaluations are pressed on the court—while Colon–Gonzalez's certainly did not. And, of course, Eccleston's stated intention to retire in six months underscored the fact that his performance in the future would not be what was needed as he could not be placed on long-term projects.

Plaintiff has not established a *prima facie* case much less shown any genuine issue of fact that its reasons for Eccleston's layoff were a pretext for discrimination. Summary judgment will be granted as to Eccleston's layoff claim.

## C. Statistical Evidence

■ In addition to what it suggests is evidence of specific instances of discriminatory treatment, which suggestion this court has rejected, plaintiff alleges that a statistical analysis of the MCII layoffs supports a finding that MCII maintained a "pattern and practice" of selecting older employees creating an inference that the layoffs here were made pursuant to this policy. Pl.Opp.Br. at 3. Once this "pattern and practice" has been

established by plaintiff, and it can be even though MCII does not discriminate uniformly, the burden, argues plaintiff, shifts to MCII to show that individual employees were terminated for legitimate reasons. *Id.* The case on which it relies for this pattern and practice argument in ADEA cases is *United States v. Lansdowne Swim Club,* 713 F.Supp. 785, 806 (E.D.Pa.1989), *aff'd,* 894 F.2d 83 (3d Cir.1990). *Lansdowne* is not even an ADEA case. Moreover, even if statistical evidence is sufficient to raise an inference of discrimination, and it can be, plaintiff's failure to raise a genuine issue of fact in response to defendant's evidence that each claimant was laid off for reasons unrelated to age bias, undercuts the importance of even unassailable statistical evidence and rebuts the inference of discrimination which arose therefrom. *Barnes,* 896 F.2d at 1469.

Nonetheless, and for whatever it is worth,[27] the court will discuss the statistical evidence plaintiff has submitted and, specifically, the expert report of Dr. Bernard R. Siskin, which concludes that "it is my opinion that the age characteristics of RIFFED employees were statistically significantly different than the age characteristics of employees not RIFFED, to the detriment of the older employees." Siskin Aff. ¶ 3. MCII, of course, presents the report of its own expert, Dr. David Peterson, which concludes "[i]t is my view that the revised study fails to illuminate the issues of age discrimination relevant to this case." Peterson Aff. ¶ 5.

The revised analysis put forth as evidence by plaintiff in this motion is a study of 444 nonunion salaried workers at the Piscataway, New Jersey site. Siskin Study, Siskin Aff. Exh. 2 (hereinafter "Siskin Study") at 1. Of the 444 persons in this group, 94 were laid off, or 11%. *Id.* at 2. The percentage of employees over forty who were laid off is 14.3%, while 7.3% of employees under forty were laid off; the percentage of employees over 50 who were laid off is 23.1%, while 7.4% of employees under 50 were laid off; and the percentage of employees over 60 who

**27.** The Third Circuit approved the use of statistical evidence in *Green v. USX Corp.,* 843 F.2d 1511 (3d Cir.1988), a disparate treatment class action lawsuit, in which the plaintiffs alleged that USX's overall hiring system discriminated against equally qualified blacks but did not challenge any specific procedures or hiring decisions. That case, of course, is not this case.

were laid off is 50%, while 9% of those employees under 60 were laid off. These percentages, if taken at face value, indicate statistically significant disparities between the layoff of older employees as compared to younger employees.[28]

MCII's expert, Dr. Peterson, makes several arguments as to why these statistics do not support a sound conclusion that age was a factor in layoff decisions. First, he points out that plaintiff's model fails to account for employees whose termination was the result of voluntary actions—either by request for severance or by refusal to relocate. MCII contends that 20 of the 94 people fall into this category. Indeed, the Third Circuit noted that if older employees who accepted early retirement had been accounted for in the case before it, the number of older workers may have been substantially reduced and, thus, the statistics concerning the pre- and post-RIF workforce may have been misleading. *Healy,* 860 F.2d at 1218.

Second, Dr. Peterson notes that although not all of the layoffs occurred in May, 1988, plaintiff's analysis presumes that the proper point of age comparison between those laid off and those not laid off is May, 1988. Thus, for terminations which occurred after May, 1988, the age of the employee laid off should be compared to the employees then at the Piscataway facility. Moreover, Dr. Peterson is quick to point out that plaintiff's analysis lumps together all nonunion employees at the Piscataway facility and fails to account for other differences among employees which would place one employee at greater risk of being laid off than another worker. Employees are, after all, not interchangeable. In this regard, he states that factors such as membership in a particular department and job skills and performance put some employees at a greater risk of layoff than others. Plaintiff has, indeed, submitted little more than raw numerical comparisons which, unaccompanied as they are by any underlying

data as to various factors which could inform those comparisons much less any analysis thereof, are not probative of an alleged discriminatory motive. *Ezold,* 983 F.2d at 543. Finally, Dr. Peterson characterizes as meaningless plaintiff's comparison of the ages of new employees hired with the ages of employees laid off. The age composition of the workforce subject to layoff, *i.e.,* the MCII work force existing at that time, is totally different from the universe of people seeking employment, and a comparison of the two is "predestined to mirror the fact that people are younger when hired than they are when they leave." Peterson Report at 1.

Perhaps in response to MCII's critique of its study, plaintiff has also submitted a statistical analysis which attempts to account for certain non-age characteristics which could affect the likelihood of an employee being laid off. Thus, it attempts to analyze the likelihood that age was a determinative factor within each category of employees broken down by pay grade, department, and job title.[29] With this revision, plaintiff's expert's report concludes that employees older than 40 (or 50) were statistically significantly more likely to be laid off than employees under 40 (or 50) for each variation of breakdown examined with one exception (when broken down by job title, the number of employees over 40 who were laid off was not statistically greater than the number of employees under 40 who were laid off). This, Dr. Siskin concludes, means that the statistically significant disparity between the number of employees laid off who were over 40 (or 50) and those under 40 (or 50) is not "explained" by differences in pay grade level, department grouping, or job title. Siskin Report at 2.

The court has before it two conflicting expert reports—one which concludes that a statistical analysis of the ages of the employees laid off from MCII's Piscataway facility supports an inference that age discrimination

---

**28.** It should be noted that plaintiff's statistical study did not reveal a statistically significant correlation between years of service and layoff or between salary and layoff. Siskin Report at 7.

**29.** MCII's expert criticizes the breakdown of departments. He states that the company's scores of departments were aggregated into just seven

"departments" for purposes of the analysis and because termination decisions were usually made at the department level, such aggregation fails to adequately take into account different functions and budgetary characteristics within each broad "department."

played a part as a matter of pattern and practice in the decision making process and the other which concludes that no meaningful statistical analysis can be made of the layoffs because factors such as department, job title, date of termination, and performance can never be adequately or intelligently culled into large enough groups to yield reliable results. The court is wary of the pliable nature of statistics. The flaws pointed out by Dr. Peterson raise serious questions. And, as MCII points out, plaintiff has not brought a disparate impact case on behalf of all MCII employees over the age of forty. This is, rather, a disparate treatment case brought only on behalf of certain employees in the protected age group. As the Third Circuit observed, "[t]he very nature of disparate treatment cases focuses on the bias against an individual because of age, race or sex. Because such bias is irrational, it may not follow a consistent pattern". *Healy,* 860 F.2d at 1218. Moreover, where the claim is that one was discriminated against personally on the basis of age, statistical evidence concerning company-wide discharge patterns is tangential to the behavior of the relevant decision makers. *Id.*

The ultimate determination of liability must turn on the evidence as to each and every claimant. While recognizing that under certain facts and circumstances, statistics can be useful, here, where plaintiff has not raised a genuine issue of fact that any claimant was discriminated against on the ground of age, plaintiff's statistics, with or without their apparent flaws, simply do not make a difference.

### V. Retaliation and Refusal to Rehire Claims [30]

#### A. Exhaustion of Administrative Remedies

MCII moves for summary judgment on all claims of retaliation and refusal to rehire because no such claims were raised with the EEOC and, therefore, these claims were not the subject of any conciliation attempts. Section 7(b) of the ADEA requires that prior

to instituting an action under that section, the EEOC must "attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of this chapter through informal methods of conciliation, conference, and persuasion." 29 U.S.C. § 626(b). This jurisdictional prerequisite is aimed at promoting informal methods of conciliation without resort to formal litigation. *EEOC v. Hugin Sweda, Inc.,* 750 F.Supp. 165, 166 (D.N.J. 1990) (citing *EEOC v. Prudential Federal Sav. and Loan Ass'n,* 763 F.2d 1166 (10th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985)).

It is undisputed that only two of the claimants, Joseph Gleitman and Dominick DeCeglie, filed administrative charges of discrimination. Stip. ¶ 24. No administrative charge alleging retaliation or refusal to rehire was ever filed, even by them. *Id.* ¶¶ 26–27. This is not, however, an impenetrable jurisdictional obstacle. Rather, "a district court may assume jurisdiction over additional charges if they are reasonably within the scope of the complainant's original charges and if a reasonable investigation by the EEOC would have encompassed the new claims." *Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984); *see also Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 399 (3d Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 *reh. den.,* 430 U.S. 911, 97 S.Ct. 1187, 51 L.Ed.2d 589 (1977). It is clear in this context that the Third Circuit has rejected the argument that the EEOC's investigation "sets the outer limit to the scope of the civil complaint." *Hicks v. ABT Associates, Inc.,* 572 F.2d 960, 966 (3d Cir.1978).

The question before this court, therefore, is whether the retaliation and refusal to rehire claims of Gleitman and DeCeglie are reasonably within the scope of the complainants' original charges and whether a reasonable investigation by the EEOC would have encompassed these claims. *Howze,* 750

---

**30.** Plaintiff has lumped the failure to rehire and retaliation claims of its thirty-four claimants into four pages of its brief and has offered, in the most cursory way, virtually no who, what, where, when, or why. By even attempting to deal with

these claims and glean from the record what arguments plaintiff might have raised had it taken the time to do so, this court has given plaintiff inordinately more than its submission warrants.

F.2d at 1213; *see also EEOC v. Westinghouse Elec. Corp.*, 632 F.Supp. 343, 362 (E.D.Pa.1986) ("The EEOC is not limited to its initial allegations; rather 'a complaint filed by the EEOC is limited to the investigation *reasonably expected* to grow out of the initial charge of discrimination.'") (emphasis in original) (quoting *EEOC v. KECO Industries, Inc.*, 748 F.2d 1097, 1101 (6th Cir. 1984)), *vacated*, 869 F.2d 696 (3d Cir.1989), *vacated mem.*, 493 U.S. 801, 110 S.Ct. 37, 107 L.Ed.2d 7 (1989), *on remand*, 907 F.2d 1354 (3d Cir.), *vacated*, 917 F.2d 124 (1990).

Although MCII takes care to note in its factual recitation that the EEOC's investigation of the charges filed by Gleitman and DeCeglie was limited to layoff claims, it recognizes that the actual content of the EEOC investigation is not determinative of the scope of a permissible action in federal court. *Hicks*, 572 F.2d at 966. Here, the charges of retaliation and failure to rehire relate to discrimination based on age, the same as the original charges filed with the EEOC. *Gavin v. Peoples Natural Gas Co.*, 464 F.Supp. 622, 624 (W.D.Pa.1979) (claim of race discrimination would not have grown out of investigation of claim based on religious discrimination), *vacated on other grounds*, 613 F.2d 482 (3d Cir.1980). The court concludes that the claims of retaliation and failure to rehire are such that they are fairly within the scope of the investigation growing out of the charges filed with the EEOC and that, therefore, these claims should not be dismissed for failure to exhaust administrative remedies. *See Howze*, 750 F.2d at 1212; *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir.1984); *Ostapowicz*, 541 F.2d at 399.

### B. Individual Claims of Failure to Rehire

Beyond its jurisdictional argument, MCII contends that the retaliation and refusal to rehire claims are ripe for summary judgment because none of the claimants can establish a *prima facie* case as to either of these types of violations. With respect to the claims of failure to rehire, a *prima facie* case consists of a showing that (1) the claimant belongs to the protected class; (2) the

claimant applied for and was qualified for the job; (3) the claimant was rejected despite his or her qualifications; and (4) the employer either ultimately filled the position with someone sufficiently younger to permit an inference of age discrimination or continued to seek applicants from those having the claimant's qualifications. *Fowle*, 868 F.2d at 61. MCII argues that summary judgment is appropriate on these claims because none of the claimants can establish that he or she applied for reemployment with MCII.

It is not necessary for a plaintiff to show that he or she filed a formal application in order to establish that he or she applied for employment for purposes of establishing a *prima facie* case. *Id.* at 68. Rather, it is sufficient if the plaintiff can show that the employer had some reason or duty to consider him or her for the position. *Id.* Plaintiff argues that this element has been satisfied because an MCII policy *required* it to consider laid off employees for rehire. Pl.Opp.Br. at 45. The evidence reveals, however, that MCII's policy with respect to rehiring employees laid off pursuant to a reduction in force, as here, is that such employees are *eligible* for rehire and may be considered for openings along with other applicants. Briggs Dep., Exh. 1. Inasmuch as this policy provides for no automatic consideration of laid off employees and grants them no preference in hiring, it cannot support a *prima facie* case of failure to rehire. Were the law otherwise, every employer would be bound to consider its previous employees for new positions regardless of whether such employees were even remotely interested in the new positions. This is not the intention of *Fowle*.

Plaintiff's reliance on MCII's policy having proved fruitless, the individual claimants cannot satisfy the *prima facie* case requirement absent a showing that he or she formally or informally made application for a position with MCII. The evidence establishes that the bulk of the claimants never applied to MCII either formally or informally after being laid off.[31] Some of the claimants did take

---

31. *See* Barth Dep. at 13–14; Tanzi Dep. at 88; Ahern Dep. at 31; Bowen Dep. at 13; W. Carne-

gie Dep. at 20; Chesley Dep. at 50–51; Coppola Dep. at 56–57; Marsh Dep. at 62; Symbleme

actions which could be deemed to satisfy the "application" requirement as described in *Fowle.* A review of these claimants with an eye towards all four of the requirements for a *prima facie* case is in order.

### 1. *Peter Wu*

■ Peter Wu testified that he contacted MCII three times between December, 1988 and 1990 and that each time he was told that there were no openings. *See* Wu Dep. at 16–19. Having shown that he made informal inquiries for job opportunities, Wu must also show that there were openings for which he was qualified. Prior to layoff, Wu was a Senior Member of the engineering staff. Stip. ¶ 356. Plaintiff points to evidence that despite the fact that Wu was told that there were no openings, the Engineering Department hired two engineers in October, 1988. Pl.Trial Exh. 157. Assuming that Wu was qualified for these positions, as it appears, he still cannot establish a *prima facie* case. The two engineers were hired in October, 1988 and Wu's first inquiry with respect to reemployment was in December, 1988. Thus, at the time Wu "applied," two positions had recently been filled. While the fact that the hirings occurred shortly after the Wu was laid off may have been evidential with respect to his layoff claim, it is not so with respect to the failure to rehire claim. A plaintiff applying after a position is filled cannot establish a *prima facie* case of failure to rehire. *See Marshall v. Airpax Electronics, Inc.,* 595 F.2d 1043, 1044–45 (5th Cir. 1979); *Smith v. World Book–Childcraft Int'l, Inc.,* 502 F.Supp. 96, 99 (N.D.Ill.1980). Thus, Wu has failed to establish a *prima facie* case and the failure to rehire claim must be dismissed as to him.

### 2. *Joseph Gleitman*

Gleitman testified at his deposition that he spoke to Nicholas Marano, MCII's Director of Human Resources, in September, 1989 at an EEOC factfinding meeting and asked if he could get an engineering position, his only contact with MCII with regard to reemploy-

ment. Gleitman Dep. at 26. This is sufficient to give MCII a reason to consider him for reemployment if such positions became available. *Fowle,* 868 F.2d at 68. But again, as with Wu, Gleitman was an engineer, and the two positions in the Engineering Department in October, 1988 were not openings for which he should have been rehired. Indeed, Gleitman's failure to rehire claim suffers from the same flaw as that of Wu, i.e. Gleitman's informal "application" for reemployment came in September, 1989, almost a full year after the Engineering Department had hired two engineers. For the reasons expressed above with respect to Wu, Gleitman's failure to rehire claim must fail.

### 3. *Faye Jahr*

■ Faye Jahr applied to MCI several times, both verbally and by submitting a resume. Jahr Dep. at 22. Two of the positions for which she applied were in the area of project management. *Id.* at 22–25. One contact was in response to an advertisement published in March, 1992 for a staff assistant in the customer support department. *Id.* at 25; Jahr Aff. ¶ 4, Exh. 1. Jahr received no response to her fax and the position was readvertised in June, 1992. *Id.* In response to an advertisement run in July, 1992, she applied for the positions of major accounts representative, senior account executive, and account executive. *Id.* ¶ 5, Exh. 3. Her application for these positions was rejected. *Id.* ¶ 6. Jahr has not shown that these positions were filled by younger persons, and it is far from certain that, despite her say-so, she herself was qualified, given that her former position had been as Senior Product Trainer, designing new product packages and programs, updating old programs, and making presentations of products and services. Jahr Dep. at 66. Moreover, the fact that she did not hear from MCII after she applied in response to the advertisement in March, 1992 with the position readvertised some months later does not an age discrimination case make, particularly where, as here, plaintiff has not shown that MCII even received Jahr's application or that it continued to seek

Dep. at 25–26; Theodore Dep. at 22; Andres Dep. at 28–29; A. Carnegie Dep. at 13; Reddo Dep. at 19; DeCeglie Dep. at 18; Juskow Dep. at

13; McConney Dep. at 27; Moran Dep. at 18; Palumbo Dep. at 54–55; Sharp Dep. at 28–30; Gold Dep. at 55–56.

applicants with Jahr's qualifications. Indeed, other than one citation to Jahr's deposition found within a string cite of references to other depositions, Jahr's name is not even mentioned in the four pages of plaintiff's brief that deals with the rehire and retaliation claims. Jahr has not demonstrated a *prima facie* case of failure to rehire.

### 4. *Nelson Caro*

■ Nelson Caro has demonstrated, again with no help from plaintiff's brief, that he made sufficient efforts to constitute "reapplication" to MCII. He personally delivered a resume to his former supervisor, Patrick McKenna, and to another former manager and followed up with telephone calls. Caro Dep. at 67–68. Although McKenna told him that there was a possibility that there was an opening for a technical supervisor position, Caro was not aware if there ever was such an opening or, if there was, if it was ever filled. *Id.* at 68–71. The "evidence" as to Caro's failure to rehire claim does not support a *prima facie* case. Indeed, all that has been established is that one person Caro contacted thought a position might open up some time in the future. It has not been established that such a position did become available or that, if it did, it was filled by a person younger than Caro or that MCII continued to seek applicants despite knowing of Caro's interest. Caro's failure to rehire claim must be dismissed.

### 5. *Alan Wagner*

Alan Wagner found out about an opening for a technician in MCII's bargaining unit from an MCII employee. Wagner Dep. at 87–88. He contacted MCII's Human Resources department and was advised that he should send a resume. *Id.* at 88. He personally delivered a cover letter and a resume, but never received any response from MCII. *Id.* at 88–89. As in the case of Nelson Caro, however, plaintiff has failed to show that this position was ever, in fact, filled. *Id.* at 90. Wagner's failure to rehire claim must be dismissed.

### 6. *George Doss*

The deposition testimony of George Doss is unclear as to whether he applied for reemployment with MCII. Although he initially stated that he did reapply, he later admitted that he never went to the personnel department and sought to be rehired. Doss Dep. at 41–42. Assuming that Doss' actions were sufficient to constitute an application for purposes of a *prima facie* showing, plaintiff has utterly failed to adduce evidence even suggesting that there was an opening for which Doss was qualified. Plaintiff's rehire claim as to Doss must fail.

### 7. *William Terbo*

William Terbo contacted MCI's offices in McLean, Virginia to see if there were employment opportunities and was not advised of any openings. Terbo Dep. at 17–19. He also contacted several people at MCII to "keep informed" about job possibilities. *Id.* at 20–21. While these efforts are sufficient to satisfy the "application" prong of the *prima facie* case, there is no indication that there was a position open for which Terbo was qualified. Indeed, each of the individuals at MCII with whom Terbo spoke indicated that there were no openings. *Id.* at 21–25. Plaintiff has clearly failed to establish a *prima facie* case of failure to rehire with respect to Terbo.

### 8. *Dorothy Unger*

Dorothy Unger, who had been a technical librarian, sent a resume to Eloise Glasgall, who she had been told was in charge of the libraries at MCII, approximately two months after being laid off. Unger Dep. at 29–30. Unger testified that Glasgall informed her that she had heard good things about her and that "if they opened it," she would be the first one Glasgall would call. *Id.* at 30–31. There is no evidence that there were any subsequent openings in MCII's libraries or that MCII later hired anyone for a position for which Unger would have been qualified. Therefore, Unger has failed to establish a *prima facie* case of failure to rehire.

### 9. *Eugene Stanley*

Eugene Stanley testified that although he had not made a formal application for reemployment at MCII subsequent to being laid off, he had informal discussions with Bob DiGiovanni of MCII. Stanley Dep. at 55–56. DiGiovanni told him that although there was some consideration given to trying to rehire Stanley as a consultant on several large projects, "it never went anywhere." *Id.* at 56. Once again, plaintiff has failed to submit any evidence to show that there was a position open for which Stanley qualified and was not hired. His failure to rehire claim fails.

### 10. *Stephen Safka*

Stephen Safka told people with whom he had worked at MCII that he would accept a job offer with MCII if it were commensurate with what he had done before. This information was sufficient, under *Fowle,* to give MCII a reason to consider him for appropriate job openings. That having been said, there is no evidence which would support a finding that there was an opening for which Safka was qualified but not considered. Safka Dep. at 22–23. Indeed, Safka testified that he worked for MCI as a consultant in January and February of 1990. *Id.* at 23. A *prima facie* case as to Safka has not been established.

In sum, in addition to the jurisdictional impediment, no claimant has established a *prima facie* case of failure to rehire. MCII's motion for summary judgment is granted as to the failure to rehire claims.

### C. Individual Claims of Retaliation

 Because the basis of plaintiff's retaliation claim is the alleged refusal of MCII to rehire certain employees, this claim is derivative of the refusal to rehire claims. Moreover, this claim is limited in scope to Joseph Gleitman, Peter Wu, George Doss, and Calvin Gum. Answer to Defendant's Second Set of Interrogatories No. 2, Def. Exh. C. A claimant may make a *prima facie* showing of retaliation generally by demonstrating that (1) he or she engaged in protected activity; (2) he or she was discharged subsequent to or contemporaneously with such activity; and (3) a causal link exists between the protected activity and the discharge. *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). Where; as here, the retaliation alleged is not discharge but, rather, retaliatory failure to rehire, the second element of a *prima facie* case should be that the claimant was not rehired subsequent to or contemporaneously with the protected activity. Thus, if these claimants cannot establish a *prima facie* case of failure to rehire, i.e. they have not brought forth evidence showing that sufficient "application" was made or that there was a position open for which they were qualified and, jurisdictional impediments aside, they *a fortiori* cannot establish a *prima facie* case of *retaliatory* failure to rehire.

The court need look no further than the failure to rehire claims of Gleitman, Wu, Doss, and Gum, none of which has been established. As a result, their retaliation claims must likewise fail.

### VI. Conclusion

Defendant's motion for summary judgment is granted as to all the layoff, failure to rehire, and retaliation claims now before the court. An appropriate order will issue.

### ORDER

This matter being opened to the Court on defendant MCII's motion for summary judgment on the layoff claims brought on behalf of thirty-four of the thirty-nine claimants and on all the failure to rehire and retaliation claims; and

For the reasons expressed in this Court's opinion of even date,

IT IS on this 30th day of July, 1993

ORDERED that defendant's motion for summary judgment be and hereby is granted.